**SANDWICH CHEF OF TEXAS, INC. d/b/a Wall Street Deli, Individually and for Others Similarly Situated, Plaintiffs,**

v.

**RELIANCE NATIONAL INDEMNITY INSURANCE COMPANY f/k/a Planet Insurance Company, et al., Defendants.**

No. Civ.A H–98–1484.

United States District Court,
S.D. Texas,
Houston Division.

Aug. 8, 2001.

Scott Monroe Clearman, McClanahan & Clearman, Houston, TX, Charles M. Silver, Attorney at Law, Susan Klein, Attorney at Law, Austin, TX, for plaintiffs.

Van Harold Beckwith, Baker Botts, Jeffrey J. Cox, William Paul Johnson, Baker & Botts, Robert W. Jordan, Baker Botts LLP, Dallas, TX, William R. Pakalka, Richard N. Carrell, Fulbright & Jaworski, D. Gibson Walton, Vinson & Elkins, Houston, TX, Robert C. Walters, Vinson & Elkins, Dallas, TX, Michael H. Barr, Sonnenschein Nath & Rosenthal, Roger D. Higgins, Thompson Coe et al., Dallas, TX, Margo Weinstein, Sonnenschein Nath et al., Chicago, IL, David J. Schubert, Lynn Tillotson et al., Dallas, TX, J. Hampton Skelton, Skelton, Woody, & Arnold, Austin, TX, Brian Carl Newby, Cantey Hanger et al., Austin, TX, Craig P. Kalil, Aballi Milne et al., Miami, FL, Forrest C. Roan, Cantey & Hanger et al, Austin, TX, David T. Moran, Jackson & Walker, Dallas, TX, Patricia J. Villareal, Jones Day et al, Dallas, TX, James L. Sowder, Thompson Coe Cousins & Irons, Dallas, TX, David J. Healey, Weil, Gotshal et al., Robert Blake Lytle, Arnold, White & Durkee, Houston, TX, Lyman Gary Hughes, Carrington, Coleman et al., Dallas, TX, Rowe W. Snider, Lord Bissell & Brook, Chicago, IL, Ernest, Ryan, Higginbotham, Strasburger and Price, Dallas, TX, J. Wiley George, Strasburger & Price, Houston, TX, Randall A. Hack, Joseph E. Coughlin, Lord, Bissell & Brook, Chicago, IL, Michael Lowenberg, Akin, Gump, Strauss, Hauer and Feld, Dallas, TX, Curtis L. Frisbie, Jr., Gardere Wynne et al., Dallas, TX, David L. Orr, Kuperman Orr et al., Austin, TX, Michael L. McCluggage, Wildman, Harrold et al., Chicago, IL, Joel W. Mohrman, McGlinchey Stafford, Houston, TX, James R. Safley, Robert J. Gilbertson, Robins Kaplan et al., Minneapolis, MN, Thomas B. Keegan, Robins Kaplan et al., Chicago, IL, John E. Chapoton, Jr., Cunningham, Darlow et al., Houston, TX, Heather E. Rennie, David E. Tungate, Eckert Seamans et al., Pittsburgh, PA, Robert L. Fleischman, Robert A. Julian, Murphy, Sheneman et al., San Francisco, CA, Rolf S. Woolner, Murphy, Sheneman et al., Los Angeles, CA, Mark A. Olson, Craig A. Raabe, Robinson & Cole, Hartford, CT, John M. Skrhak, Looper Reed et al., Dallas, TX, Robert A. Izard, Jr., Robinson and Cole, Hartford, CT, for defendants.

## ORDER

HITTNER, District Judge.

Pending before the Court is the Motion for Class Certification filed by Plaintiff Sandwich Chef of Texas d/b/a Wall Street Deli ("Wall Street"). Having considered the motion, submissions, and applicable law, together with the evidence and arguments of counsel presented at a class certification hearing conducted January 8–12, 2001, the Court determines that the motion for class certification should be granted.

### I. BACKGROUND

Wall Street operates delicatessens in several states. From 1991 through 1994, Wall Street bought four workers' compensation insurance policies from Defendant Reliance Insurance Company ("Reliance"). Each policy was made subject to retrospective rating by a "WC 00 05" endorsement. Wall Street claims that Reliance overcharged for this coverage by illegally inflating a regulated premium factor, that other Defendants did the same to their policyholders, and that all Defendants jointly conspired to overcharge policyholders and to conceal their misconduct from state regulators. The other Defendants in this case are approximately one hundred fifty insurance carriers.

Wall Street alleges that Defendants' scheme corrupted the National Council on Compensation Insurance, Inc. ("NCCI"), a private enterprise established and controlled by Defendants. NCCI is the official rating organization for many states. Acting for Defendants, NCCI files proposed rates, policy forms and manuals with state regulators for approval. Under the plan manuals approved by state regulators, NCCI is delegated other official functions. NCCI receives and then files retrospectively rated policies with state regulators and is responsible for

verifying that Defendants' actual retrospective plan factors conform to plan factors approved by the states. According to Wall Street, NCCI and Defendants knowingly submitted misleading filings that were intended to, and did, lead regulators to believe that Defendants were charging filed rates when they were actually charging additional and unfiled residual market subsidies. NCCI is also alleged to have given other support to Defendants' scheme, including distributing information Defendants used to set their unauthorized charges and providing Defendants opportunities to meet and discuss their scheme.

Wall Street's complaint alleges that Defendants' scheme to defraud policyholders violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968 ("RICO"). Wall Street seeks to recover RICO damages for itself and a proposed class of employers who purchased retrospectively rated workers' compensation insurance in one or more of forty-four states and the District of Columbia.

Wall Street seeks damages proximately caused by two aspects of Defendants' alleged scheme. First, Wall Street asserts that Defendants made false filings with state regulators that allowed them to charge illegal premiums (fraud-on-the-regulator theory). Second, Wall Street asserts that Defendants sent invoices demanding amounts above those prescribed by Defendants' applicable rate filings in the relevant jurisdictions (invoice theory).

Wall Street filed its motion for class certification on December 3, 1999. The parties submitted extensive briefing on the motion for class certification, and the Court conducted an evidentiary class certification hearing from January 8 through January 12, 2001.

## II. WALL STREET'S PROPOSED CLASS & PROPOSED TRIAL PLAN

### A. Proposed Class

Wall Street moves to certify the following class:

> All purchasers of workers' compensation insurance policies, effective on or after January 1, 1987, endorsed with a Retrospective Premium Endorsement (NCCI form WC 00 05 series) and not closed by a final premium calculation on or before May 6, 1994; except for purchasers of policies endorsed as a Large Risk Alternative Rating Option (LRARO), purchasers that participated in captive insurance that reinsures their risk, and defendants and co-conspirators.

Wall Street explains the proposed class definition as follows. The required endorsements, WC 00 05 series, are the standard forms for Option V workers' compensation policies.[1] All risk in a state covered by a WC 00 05 endorsement is subject to the same formula for calculating premiums, the same filing requirements, and the same authorized rating plan factors.

The January 1, 1987 start date for membership in the class is the approximate time Defendants are alleged to have first met at NCCI and discussed requiring policyholders to bear all costs associated with assigned risk pools, the alleged motive for Defendants' scheme. May 6, 1994 is four years before the date Wall Street filed its RICO complaint. The requirement that a policy not have been closed by a final premium calculation on or before this date ensures that the class contains only policyholders that received invoices for workers' compensation premiums within the four year limitations period.

The class definition excludes coverage written under a Large Risk Alternative Rating Option ("LRARO") endorsement. LRARO coverage differs from Option V coverage in that, under LRARO, the retrospective formula and plan factors are negotiable. The exclusion of policyholders with captive reinsurers removes policyholders who, in effect, would have been overcharging themselves. The exclusion of Defendants and co-conspirators serves the purpose of avoiding an intra-class conflict.

---

1. The term "Option V" refers to all retrospective plans written during the class period that are governed by the same rating plan and endorsements that were, prior to December 1, 1991, specifically identified as "Option V."

## B. Proposed Trial Plan

In addition to its motion to certify the class, Wall Street filed a Proposed Trial Plan and a Supplemental Proposed Trial Plan (the "Trial Plan"). The Trial Plan identifies three phases to manage the proposed class: legal issues, factual issues, and damages.

Phase one would require the Court to decide pertinent legal issues.[2] Namely, the Court would need to: (1) determine whether Defendants were legally required, by the applicable state laws, to use filed rating plan factors when charging for Option V coverage; (2) assemble a grid of required filed rating plan factors or verify that same are contained in the "RQS" computer program[3] (qualified, if need be, by company-specific filings); (3) determine whether reliance is self-proving as a matter of law for policyholders who received and paid invoices; (4) classify disputed policies as Option V or LRARO; (5) determine the significance of "side agreements" in the policies; (6) decide whether to allow Defendants to assert counterclaims against absent class members; and (7) review test runs of actual damage formulas on samples of actual account information to ensure presentation of damages figures in proper form.

Phase two would involve a jury determination of factual issues. The factfinder would be asked to decide: (1) whether Defendants conspired to charge Option V policyholders residual market subsidies that exceeded the subsidies provided for in the filed tax multipliers; (2) whether Defendants committed mail fraud by sending out invoices demanding unauthorized premium charges; (3) whether Defendants committed mail fraud by sending rate filings to state insurance regulators misrepresenting the amounts they would charge policyholders for insurance coverage; (4) whether Defendants used the NCCI to effectuate their conspiracy through a pattern of racketeering activity; (5) whether payment of an inflated invoice constitutes reliance for the purpose of establishing proximate cause under RICO; (6) whether Option V policyholders were direct targets of Defendants' scheme, thereby establishing proximate cause under RICO; and (7) the amount by which Defendants overcharged Wall Street individually and the class as a whole.

Phase three, applicable only if the class prevails, would involve distribution of damages to the class. Individual damages would be distributed on the basis of records obtained from Defendants and, if necessary, proof of claim forms submitted by members of the class.

## III. DEFENDANTS' OPPOSITION TO CLASS CERTIFICATION

Defendants argue that certification is inappropriate because Wall Street has failed to meet its burden of establishing the adequacy and typicality requirements of Rule 23(a) and the predominance, manageability, and superiority requirements of Rule 23(b)(3). Defendants contend that proof concerning the fraud-based RICO claims will necessarily focus on the knowledge of the thousands of employers, brokers or agents, and other insurance personnel that participated in the negotiation of the insurance programs.

Defendants also assert that a trial would consist of evidence concerning thousands of oral and written communications that formed an essential part of these negotiations, and that individual issues concerning these communications and the knowledge of each transaction's participants would vastly predominate over any common issues that might arise. Defendants argue that trying these claims would require consideration of the laws of forty-five jurisdictions regarding issues such as the applicability of varying and possibly conflicting rate filings as well as the enforceability of agreements that vary from those filings. Defendants also contend that compulsory counterclaims, defenses, and arbitration agreements are fatal to the motion for certification.

## IV. CLASS CERTIFICATION UNDER RULE 23

To attain certification of the proposed class, Wall Street must meet each of the four requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy. *See*

---

2. The Court has already made a number of preliminary legal determinations as identified in Section IV(A)(2) *infra*.

3. "RQS" stands for NCCI's Retro Quote System, a computer system created by NCCI that contains a complete set of tables showing the lawful rates for Option V coverage in every state throughout the class period.

FED.R.CIV.P. 23(a). Because Wall Street seeks to certify the class under Rule 23(b)(3), it must also show that common issues predominate and that class treatment is the superior method to resolve the dispute. *See* FED.R.CIV.P. 23(b)(3).

█ Wall Street bears the burden of proof on class certification. *See Castano v. Am. Tobacco Co.,* 84 F.3d 734, 740 (5th Cir.1996). The district court may certify a class only if a "rigorous analysis" convinces it that all conditions set out in Rule 23 are met. *Id.* In so doing, the court must consider "how a trial on the merits would be conducted" if a class were certified. *Id.* A district court may look past the pleadings to determine if Rule 23's requirements have been met. *Id.* at 744. This necessitates looking "beyond the pleadings . . . [to] understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Id.*

## A. *Rule 23(a) Requirements*

### 1. *Numerosity*

In this case, Defendants concede numerosity. Accordingly, the Court need not address whether the class is so numerous that joinder of all members is impracticable. *See* FED. R.CIV.P. 23(a)(1).

### 2. *Commonality*

Rule 23(a)(2) requires that there are questions of law or fact common to the class. FED.R.CIV.P. 23(a)(2). "The threshold of 'commonality' is not high." *Bertulli v. Indep. Ass'n of Continental Pilots,* 242 F.3d 290, 296–97 (5th Cir.2001) (citing *Jenkins v. Raymark Indus., Inc.,* 782 F.2d 468, 472 (5th Cir.1986)). A common question is one that, when answered as to one class member, "will affect all or a significant number of the puta-

tive class members." *Forbush v. J.C. Penney Co.,* 994 F.2d 1101, 1106 (5th Cir.1993).

█ This Court's prior opinion denying Defendants' motion for summary judgment identified several issues that are common to the proposed class.[4] The jury charge presents additional common questions. At trial, Wall Street must prove that: (1) there was an enterprise; (2) the enterprise engaged in, or had some effect upon, interstate commerce; (3) Defendants were employed by or associated with the enterprise; (4) Defendants knowingly and willfully conducted or participated, directly or indirectly, in the conduct of the affairs of the enterprise; and (5) Defendants did so through a pattern of racketeering activity. *See Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985); *Word of Faith World Outreach Ctr. Church, Inc. v. Sawyer,* 90 F.3d 118, 121–22 (5th Cir.1996); FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS, CIVIL 8.1 (West 1999).

Furthermore, the predicate racketeering act—knowingly devising a scheme or artifice to defraud—presents common issues of fact. Racketeering activity, for purposes of mail and wire fraud, involves proof: (6) of use of the mail or wire in furtherance of the scheme and (7) that the scheme proximately caused injury to the plaintiff. *Holmes v. Sec. Investor Prot. Corp.,* 503 U.S. 258, 265–68, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). Wall Street alleges a nationwide fraudulent scheme devised by Defendants, and a finding concerning Defendants' participation in that scheme will apply equally to all class members. *See Heastie v. Cmty. Bank of Greater Peoria,* 125 F.R.D. 669, 674 (N.D.Ill.1989) (noting that, under the mail fraud statute, "what is important is devising or intending to devise a scheme to defraud, and that depends only on the defendant").[5]

---

4. In that Order, the Court determined that: (1) intentional overbilling is actionable under RICO; (2) inflated invoices are misrepresentations of fact; (3) the "filed rate doctrine" does not bar Option V policyholders from suing to enforce the filed rate; (4) proximate cause can be established by showing that policyholders were direct targets of the conspiracy to overcharge; and (5) the McCarran–Ferguson Act does not preclude class members' claims. *See Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indemn. Ins. Co.,* 111 F.Supp.2d 867, 873–77 (S.D.Tex.2000).

5. *See also Grainger v. St. Sec. Life Ins. Co.,* 547 F.2d 303, 307–08 (5th Cir.1977) (class actions are appropriate where a "standardized sales pitch" is employed); *Peterson v. H & R Block Tax Servs., Inc.,* 174 F.R.D. 78, 82 (N.D.Ill.1997) (commonality exists when mail fraud involved a standard course of conduct toward class or when class members' claims arise out of standard written document); *Rohlfing v. Manor Care, Inc.,* 172 F.R.D. 330, 339 (N.D.Ill.1997) ("by definition, parties to a contract are aware and rely on the representations or omissions in the contract");

The existence of the conspiracy, its membership, its duration, and its characteristics are also common questions of fact. Where NCCI is alleged to be the enterprise, Wall Street must show the existence of a conspiracy because NCCI is under Defendants' joint control. A finding in Wall Street's favor on its conspiracy charges concerning the conduct of Defendants will apply to all class members. *See Murray v. Sevier,* 156 F.R.D. 235, 249 (D.Kan.1994) (in civil RICO conspiracy claim based upon mail fraud, "it would be senseless to require each of the members [ ], numbering over half a million, to individually assert their fraud claims against the defendants, especially where a single 'underlying scheme,' rather than a variety of distinct misrepresentations, is the fundamental basis for those claims"). Given the existence of these common legal and factual issues, Wall Street has met its burden of establishing commonality. *See* Fed.R.Civ.P. 23(a)(2).

### 3. Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). "Like commonality, the test for typicality is not demanding." *Mullen v. Treasure Chest Casino, LLC,* 186 F.3d 620, 625 (5th Cir.1999). Typicality exists when the claims of named and unnamed plaintiffs have a common source and rest upon the same legal and remedial theories. *Id.*

■ The class asserts a single cause of action, RICO, with predicate acts of mail fraud and wire fraud. The alleged injuries to the class members, including Wall Street, have a common source: the alleged conspiracy to corrupt NCCI, to deceive state regulators, and to overcharge policyholders through fraudulent billings. This alleged collusion creates typicality. Because Defendants' alleged conspiracy is causally connected to every victim's loss, the victims are typical of one another. *See In re Workers' Comp.,* 130 F.R.D. 99, 106 (D.Minn.1990) ("Nor will differing damages, resulting from varied methods of procuring and purchasing

McMahon Books, Inc. v. Willow Grove Assoc., 108 F.R.D. 32, 38 (E.D.Pa.1985) (mail fraud claim concerned single fraudulent scheme by defendants that injured all class members).

the product, defeat satisfaction of Rule 23(a)(3).").

■ Defendants challenge Wall Street's typicality in four ways. First, Defendants contend that Wall Street had LRARO coverage and therefore cannot be typical of Option V policyholders. According to Defendants, when a retrospectively rated policy exceeds the minimum premium threshold for LRARO eligibility, it automatically becomes a LRARO. The plain language of the insurance policy, however, defeats this argument. Each of Wall Street's policies, like all other workers' compensation policies, contain the following merger clause:

> The only agreements relating to this insurance are stated in this policy. The terms of the policy may not be changed or waived except by endorsement issued by us to be part of this policy.[6]

This language is clear and unambiguous. *See Protective Ins. Co. v. Montgomery Tank Lines, Inc.,* No. 89–C–2793, 1990 WL 251903, at *3 (N.D.Ill.Dec.19, 1990) ("the language of the policy is clear in its requirement that no alteration can become part of the policy until an endorsement is issued"). Parol evidence is not admissible to determine policy type or otherwise to contradict the policy. *See Hartford Acc. & Indem. Co. v. Pro–Football, Inc.,* 127 F.3d 1111, 1114 (D.C.Cir.1997) ("[W]hen [retrospectively rated workers' compensation insurance] contracts are clear and unambiguous, they will be enforced by the courts as written"); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex.1995) ("Parol evidence is not admissible for the purpose of creating an ambiguity" in an insurance contract that is not ambiguous). As required by the class definition, each of Wall Street's policies contains a WC 00 05 endorsement. None of Wall Street's policies contain any LRARO-specific endorsements or mentions LRARO. That Wall Street is subject to rate regulated coverage (Option V) may be determined by reference only to Wall Street's policies.

Second, Defendants claim that Option V policies were individually negotiated. That

6. Workers' Compensation and Employers' Liability Insurance Policy, NCCI Form WC 00 00 00 A.

Option V policies may have been customized in *some* respects is not dispositive. Wall Street contends that Defendants overcharged policyholders by inflating residual market subsidies that were fixed by filed rates and adopted into the policy by a WC 00 05 endorsement. The lawfully adopted residual market subsidies were not negotiable under the WC 00 05 endorsements. Customization of other elements of the policies in the class that were subject to negotiations has no effect upon Wall Street's typicality.

■ Third, Defendants claim that many Option V policyholders had agreements that required them to pay higher rates than the filed rates. Defendants ask this Court to ignore the tax multipliers and residual market subsidies fixed by law and instead consider negotiations, side agreements, or unfiled endorsements that allegedly demonstrate this agreement. Defendants further argue that these items demonstrate an agreement to pay inflated rates and make each class member unique.

The testimony of the experts and fact witnesses at the certification hearing was unanimous on this point: **Defendants cannot charge more than the filed rate.** The filed rate doctrine provides that a regulated entity may not engage in price discrimination among ratepayers (i.e., all rate payers must be charged the same rate for services) and that the state regulatory agency is the exclusive source of lawful rates. *E.g., Marcus v. AT&T Corp.*, 138 F.3d 46 (2d Cir.1998). Under this doctrine, all policyholders with coverage written under a WC 00 05 endorsement are subject to the same nonnegotiable rating plan factors, including the approved residual market subsidy. This ensures typicality for all policyholders with WC 00 05 endorsements.

The United States Supreme Court has stated that, under the filed rate doctrine, a purchaser of a commodity regulated by a filed rate cannot be required to pay a higher rate, even if it agreed to do so. *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 582, 101 S.Ct. 2925, 69 L.Ed.2d 856 (1981); *see also Stein v. Sprint Corp.*, 22 F.Supp.2d 1210, 1212 (D.Kan.1998) (the policy of nondiscriminatory rates is violated when similarly situated customers pay different rates for the same services). In addition to the policy's merger clause that eliminates agreements not stated in the policy, the Court cannot recognize the existence of side agreements or understandings that, Defendants assert, make each member of the class unique. If the Court were to do so, it would aid the very discriminatory pricing practices that the filed rate doctrine is intended to preclude. Moreover, the Court cannot participate in an effort to question the filed rates. No implicated jurisdiction has allowed a carrier to defeat its filed rate by means of unfiled side agreements or understandings.[7] The Court must look only to the policies of insurance, rating plans and manuals, all of which are incorpo-

7. *Am. Mut. Liab. Ins. Co. v. Plywoods–Plastics Corp.*, 81 F.Supp. 157, 165 (E.D.S.C.1948) (an agreement between policyholder and carrier for workmen's compensation coverage at rates other than those filed would be ineffective); *Nationwide Mut. Ins. Co. v. Ed Soules Constr. Co.*, 397 So.2d 775, 776 (Fla.App. 1 Dist.1981) (workers' compensation premiums calculated in accordance with applicable rules, rates and rating plans); *Walker v. Bituminous Cas. Corp.*, 74 Ga. App. 517, 40 S.E.2d 228, 229 (1946) (parties to a workers' compensation insurance policy do not have freedom to contract with respect to rates); *D.A.X., Inc. v. Employers Ins. of Wausau*, 659 N.E.2d 1150, 1156 (Ind.App.1996) (trial court properly enforced workers' compensation insurance contract by using proper classification and rates); *Mike Hooks, Inc. v. Argonaut–Southwest Ins. Co.*, 370 So.2d 141, 145 (La.App. 3d Cir.1979) (legislature removed the subject of workers' compensation rates from the field of private bargaining); *Employers' Liab. Assur. Corp. Ltd. of London, Eng. v. Arthur Morgan Trucking Co.*, 236 Mo.App. 445, 156 S.W.2d 8, 12 (1941) (the statute removed the subject of workers' compensation rates from field of private bargaining; rates can neither be nullified nor altered by any private bargaining or contract, or by acts or conduct on part of insurer in its dealings and relations with insured which might ordinarily constitute basis of claim of waiver or estoppel); *Mountain Fir Lumber Co. v. Employee Benefits Ins. Co.*, 296 Or. 639, 679 P.2d 296, 299 (1984) (workers' compensation rates must adhere to filed rates); *Assoc. Emp. Lloyds v. Dillingham*, 262 S.W.2d 544, 546 (Tex. Civ.App.—Fort Worth 1953, writ ref'd) (statutes make any agreement or contract not written into policy void as rates on workers' compensation policies are removed from field of bargaining); *Wisconsin Comp. Rating & Inspection Bureau v. Mortensen*, 227 Wis. 335, 277 N.W. 679, 685 (1938) (the filed rating plan is an effective part of the contract and the amount of the final premium to be paid by an employer is to be determined in accordance with the filed rates).

rated into each class member's contract through a WC 00 05 series endorsement.[8] Wall Street has the WC 00 05 endorsement.

 Fourth, Defendants challenge Wall Street's typicality because it did not purchase insurance from every Defendant. There is no such requirement, however. Civil conspiracy is a means for establishing vicarious liability upon all conspirators for the fraud committed by any member. *E.g., Beck v. Prupis,* 529 U.S. 494, 503, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000). Thus, plaintiffs in conspiracy actions can recover from defendants with whom they have never interacted. *Tompkins v. Cyr,* 202 F.3d 770, 783 (5th Cir.2000). When defendants have allegedly conspired to take money from many victims by means of a common course of misconduct, the claims of each victim are typical. *In re NASDAQ Market–Makers Antitrust Litig.,* 169 F.R.D. 493, 511–12 (S.D.N.Y.1996). The Court finds that Wall Street's claims and/or defenses have a common source and rest upon a single legal and remedial theory. Accordingly, Wall Street has met its burden of demonstrating that its claims are typical of the claims of the class. *See* FED.R.CIV.P. 23(a)(3).

### 4. Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately pro-

tect the interests of the class."[9] FED.R.CIV.P. 23(a)(4). The class representatives' interests must be aligned with, and not antagonistic to, unnamed class members. *Mullen,* 186 F.3d at 625–26. A sufficient alignment of interests exists when "all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class." *In re Corrugated Container Antitrust Litig.,* 643 F.2d 195, 208 (5th Cir.1981); *Bertulli,* 242 F.3d at 298 n. 33 (adequacy was present when class representatives did not seek relief at the expense of unnamed class members).

 At the certification hearing, Wall Street's vice-chairman testified by deposition and its chief financial officer testified in person. Wall Street has produced documents and answered interrogatories, selected skilled legal counsel and conferred with its attorneys about the prosecution of the action. Professor John C. Coffee, Jr. of Columbia Law School testified that Wall Street's claim for more than $150,000 gave it an appropriate stake in the action.[10] The fact that Wall Street's claim is large does not affect class certification. Just as the participation of large-claim named plaintiffs is encouraged in securities fraud class actions, there is no reason to discourage such participation in RICO class actions.[11] Wall Street has, and

---

**8.** The Court notes that Wall Street does not contend that premium payment agreements are per se void. Wall Street alleges only that, as a matter of law, Defendants cannot use side agreements to justify overcharges above the filed rates. Side agreements that do not run counter to the filed rates are enforceable. *See Cananwill, Inc. v. EMAR Group, Inc.,* 250 B.R. 533, 555–56 (M.D.N.C.1999) (a side agreement that "did not implicate a primary purpose" of state law was enforceable); *see also Tankersley v. Durish,* 855 S.W.2d 241, 247 (Tex.App.–Austin 1993, writ denied) ("the mere presence of an illegal side agreement does not invalidate a policy").

**9.** The district court must also find that the lawyers who will be responsible for trying the case are competent to pursue the action. *E.g., In re Workers' Comp.,* 130 F.R.D. at 107; *see also Roper v. Consurve, Inc.,* 578 F.2d 1106, 1112 (5th Cir.1978). In this case, the lawyers for the proposed class are with the firm of McClanahan & Clearman, L.L.P. and Professors Susan Klein and Charles Silver of the University of Texas School of Law. These lawyers have extensive experience and expertise in class action litigation, workers' compensation insurance, and

RICO. Defendants have conceded that Wall Street's counsel meet the adequacy requirement, and the Court agrees.

**10.** The emerging consensus is that a sophisticated person with a sizable claim is well-suited to act as a named plaintiff. *See generally* Elliott J. Weiss & John S. Beckerman, *Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions,* 104 YALE L.J. 2053 (1995) (arguing that claimants with a significant stake in the outcome would most effectively represent the class). Congress endorsed this consensus when it enacted the Private Securities Litigation Reform Act of 1995. Under this Act, the plaintiff with the largest financial interest is the presumptively adequate named plaintiff and is entitled to select counsel for the class. 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I) (1997). The Court believes that this provides persuasive authority for the instant issue.

**11.** Defendants cite this Court's opinion in *Ford v. NYLcare Health Plans of the Gulf Coast, Inc.,* 190 F.R.D. 422 (S.D.Tex.1999), as an alleged prohibition against the certification of non-"negative

can be expected to, put up a genuine fight as required by Rule 23(a)(4). *See In re Workers' Comp.*, 130 F.R.D. at 107; *see also Roper v. Consurve, Inc.*, 578 F.2d 1106, 1112 (5th Cir.1978).

██ Defendants argue that Wall Street's decision to only assert a RICO claim will preclude absent class members from asserting other claims, thus creating an intraclass conflict.[12] The Supreme Court has recognized, however, that judgments on classwide claims do not prevent class members from subsequently asserting individual claims based on omitted legal theories. *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 878–81, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984) (adverse judgment in a Title VII class action did not preclude plaintiffs from bringing individual suits). Moreover, because this is a Rule 23(b)(3) class, dissatisfied class members can opt out of the class. *See* FED.R.CIV.P. 23(c)(2); *Bertulli*, 242 F.3d at 298; *Jenkins*, 782 F.2d at 472 n. 5. Accordingly, Wall Street's choice to pursue this case under RICO does not create an intraclass conflict. "[O]nly a conflict which goes to the very subject matter of the litigation will defeat a party's claim to representative status...." *Jenson v. Cont'l Fin. Corp.*, 404 F.Supp. 806, 811 (D.Minn.1975). There is no such conflict here. The Court is satisfied that Wall Street understands its duty as a named plaintiff to act for the benefit of the class. Wall Street has thus met its burden of demonstrating that it will fairly and adequately protect the interests of the proposed class. *See* FED.R.CIV.P. 23(a)(4).

Given the foregoing, the Court determines that Wall Street has met its initial burden of establishing the Rule 23(a) requirements for class certification. The Court thus turns to the question of whether the class is maintainable pursuant to Rule 23(b)(3).

### B. Rule 23(b)(3)

██ Rule 23(b)(3) provides that a class action may be maintained if the Rule 23(a) factors are met and "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." FED.R.CIV.P. 23(b)(3). The district court should consider the following factors in making its predominance and superiority determination under Rule 23(b)(3):

(1) the interest of members of the class in individually controlling the prosecution or defense of separate actions;

(2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(4) the difficulties likely to be encountered in the management of a class action.

FED.R.CIV.P. 23(b)(3)(A)–(D). In making this determination, the district court must consider variations in state law and must also address how a trial on the merits would be conducted. *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir.1996).

### 1. Individual Control over Litigation

██ The first factor, the interest of class members to control litigation individually, matters mainly when absent class members have personal injury claims. *See Georgine v. Amchem Prods., Inc.*, 83 F.3d 610 (3rd Cir. 1996), *aff'd sub nom. Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). When only economic losses are at issue, this interest to personally control the litigation is small. In a commercial case where class members are compa-

---

value" cases. However, the opinion simply states, "this suit cannot be classified as a 'negative value suit.'" *Id.* at 427. The opinion does not state that the "negative value" claim must be that of the named plaintiff. For some policyholders, with claims measuring but a few hundred or thousand dollars, this case presents just such a negative value case.

12. Defendants also argue that a class representative who exposes class members to compulsory counterclaims is not an adequate representative. The compulsory counterclaim issue is addressed in Section IV(B)(4)(c) *infra*.

nies, economic motivations and interests are paramount. As long as the named plaintiff seeks to maximize the recovery, little else matters. Companies with large claims that wish to preserve control may opt out. Wall Street argues that the class members' interest in individually controlling the prosecution of this litigation is minimal. The Court agrees and therefore turns to the remaining factors.

### 2. & 3. Other Litigation & Concentration in this Forum

Wall Street contends that the second and third factors—pendency of other litigation and the desirability of concentrating litigation in this forum—also weigh in favor of certification. Although other lawsuits are pending, the instant case is the first to rely on RICO as the major cause of action. Further, the number of policyholders that have filed individual complaints is small in comparison to the total size of the proposed class. The only case that competes with this lawsuit is a case filed by approximately sixty plaintiffs in Arizona state court. The Arizona suit, however, is not a federal RICO case, does not purport to be a class action, and does not allege a conspiracy. The relative dearth of similar RICO litigation in other courts is further evidence that class members will not individually pursue most claims. The Court also notes that, despite the incentive of treble damages and attorneys' fees available under RICO, the cost of investigating and trying these cases individually likely exceeds the alleged overcharges that policyholders paid Defendants. Furthermore, the value of concentrating litigation in this forum is particularly great because the substantive issues in this lawsuit are complicated, and this Court has already made multiple rulings on this case thus far. Accordingly, the second and third factors weigh in favor of finding predominance and superiority.

### 4. Manageability

The fourth factor addresses the difficulties likely to be encountered in the management of a class action. Defendants raise numerous arguments relating to the manageability inquiry, including: (a) variations in state law adversely affect predominance and superiority, (b) proximate cause and injury require individualized proof, thus making a trial unmanageable, (c) counterclaims for undercharges against absent class members preclude certification, (d) materiality is not a common issue, (e) defenses defeat predominance, and (f) arbitration clauses defeat predominance. As discussed below, the Court is unpersuaded by these arguments.

#### a. Variations in State Laws / Castano

Although RICO is the sole issue that will be placed before the jury, Defendants assert that whether the insurance charges are in fact illegal would embroil the Court in the interpretation and application of the laws of approximately forty-five jurisdictions. This, they argue, demonstrates the predominance of individual issues which proscribe class treatment in light of *Castano v. American Tobacco Co.*, 84 F.3d 734 (5th Cir.1996).

*Castano* is distinguishable from the instant dispute and does not prohibit certification in these circumstances. First, *Castano* was a personal injury suit alleging numerous common law causes of action.[13] Here, a single law—the federal RICO statute—is the source of Defendants' liability. Second, in *Castano*, the plaintiffs asked the court to apply conflicting state law on the liability issues of negligence and fraud. *Id.* at 741. In this case, while it is true that there is no fraud unless Defendants did, in fact, inflate the filed rate, each jurisdiction implicated by Wall Street's complaint requires Defendants to file their rates and rating plans for workers' compensation coverage and adhere to them.[14] Wall Street's RICO claim seeks to enforce these filed rates. In denying Defen-

---

**13.** *Castano* was a suit filed on behalf of all smokers and nicotine dependent persons against numerous tobacco companies and The Tobacco Institute. *Castano*, 84 F.3d at 737. The plaintiffs' causes of action included: fraud and deceit, negligent misrepresentation, intentional infliction of emotional distress, negligence and negligent infliction of emotional distress, violation of state consumer protection statutes, breach of ex-

press and implied warranty, strict products liability, and redhibition. *Id.*

**14.** *See* ALA.CODE §§ 27–13–67 & 27–13–68, § 25–5–8 (1986); ALASKA STAT. § 21.39.040 (Michie 1998); ARIZ.REV.STAT ANN. § 20–357 (West Supp. 1999); ARK.CODE ANN. § 23–67–219 (Michie Supp. 1997); COLO.REV.STAT. § 10–4–405 (1999); CONN. GEN.STAT.ANN. § 38a–676 (West 1992); DEL.CODE ANN tit. 18, §§ 2609 & 2610 (1989 & Supp.1996);

dants' motion for summary judgment, this Court previously held that "[a]pplication of RICO in this case does not directly conflict with any state regulation, but rather, complements the states' regulations by enforcement." *Sandwich Chef*, 111 F.Supp.2d at 877. Several of Defendants' witnesses, versed in insurance regulation, were questioned and none could identify any jurisdiction that allowed a carrier to charge an unfiled rate. Thus, Wall Street's RICO claim does not require the Court to apply conflicting state laws.

Moreover, the regulatory purposes for these filing requirements are important to the subject jurisdictions; besides requiring the filing of rates and rating plans, all jurisdictions subject to Wall Street's complaint uniformly require carriers to file all forms that they use in writing workers' compensation coverage.[15] The forty-five jurisdictions that authorized Option V coverage have adopted the same policy and set of mandatory endorsements, the WC 00 05 series endorsements. By definition, all policies within the class have one of these WC 00 05 endorsements that allows Defendants to write Option V workers' compensation coverage risk in several jurisdictions under one policy. Therefore, not only are the regulations of the jurisdictions that underlie Wall Street's RICO claim uniform in all material ways, but the contract language that binds the policyholders and Defendants is also the same.[16]

D.C.CODE ANN. §§ 35–205 & 35–1704 (1997); FLA. STAT.ANN. §§ 627.091 & 627.062 & 627.101 (West Supp.2000); GA CODE ANN. § 33–9–21 (1996); HAW.REV STAT.ANN. §§ 141:14–120 & 431:14–104 (Michie 1994); IDAHO CODE §§ 41–1606 & 41–1608 & 41–1609 (Michie 1998); 215 ILL COMP. STAT ANN 5/457–458 (Supp.1998); IND.CODE ANN. § 27–1–22–4 & 27–7–2–20.2 (Michie 1997); IOWA CODE ANN. § 515A.4 (West 1998); KAN.STAT.ANN. § 40–955 (Supp.1999); KY.REV.STAT.ANN. § 304.13–051 (Michie 1996); LA REV.STAT ANN. § 22:1407 (West 1998); ME.REV.STAT.ANN. tit. 24–A, § 2382–C (West 2000); MD.CODE ANN., INS. §§ 11–330 & 11–307 & 11–329 (1997); MASS.GEN. LAWS ANN. ch. 152, § 53A (West 1998); MICH STAT. ANN §§ 24.12406 & 500.2406 (Michie 1994); MINN.STAT ANN. §§ 70A.06 & 79.55 & 79.56 (West 1999); MISS.CODE ANN. § 83–2–7 (1999); MO.ANN. STAT. §§ 287.947 & 287.955 & 379.321 (West 1991 & Supp.2000); MONT.CODE ANN. §§ 33–16–1026 & 33–16–1030 (1999); NEB.REV.STAT. §§ 44–5020 & 44–5028 (1998); NEV.REV.STAT.ANN. § 686B.070 (Michie 1997); N.H.REV STAT.ANN. § 412:8 (1998); N.M.STAT ANN. § 59A–17–10 (Michie 1995); N.Y.INS.LAW § 2305 (McKinney 1985 & Supp.2000); N.C.GEN.STAT. §§ 58–40–30 & 58–36–15 & 58–36–20 (1994 & Supp.1997); OKLA STAT.ANN. tit. 36, §§ 903 & 901 & 996 & 998 (West 1999); OR.REV STAT. §§ 737.205 & 737.320 (1995); 40 PA.CONS STAT ANN. § 710–5 (West 1999) & 77 PA.CONS.STAT ANN. § 1035.5 (West 1999); R.I.GEN LAWS §§ 27–7.1–2 & 27–7.5–5.1 & 27–44–6 (1998); S.C.CODE ANN §§ 38–73–340 & 38–73–490 & 38–73–520 (Law.Co-op.1989); S.D.CODI-FIED LAWS § 58–24–10 (Michie 1996); TENN.CODE ANN. § 56–5–306 (1994); TEX.INS.CODE ANN. § 5.55 (Vernon 1999); UTAH CODE ANN. §§ 31A–21–201 & 31A–19–408 (1999); VT STAT.ANN. tit. 8, §§ 4687 & 4688 (1993); VA.CODE ANN. §§ 38.2–1906 & 38.2–2003 (Michie 1999); WASH REV CODE ANN § 48.19.040 (West 1999); WIS.STAT.ANN. § 626.13 (West 1995).

§ 20–398 (West Supp.1999); ARK CODE ANN. § 23–79–109 (Michie Supp.1997); COLO.REV STAT. § 10–4–419 (1999); CONN.GEN.STAT.ANN. § 38a–676 (West 1992); DEL.CODE ANN. tit. 18, § 2712 (1989 & Supp.1996); D.C.CODE ANN. § 35–1531 (1997); FLA.STAT.ANN § 627.410 (West Supp.2000); GA CODE ANN. § 33–24–9 (1996); HAW.REV.STAT.ANN. § 386–124 (Michie 1994); IDAHO CODE § 41–1812 (Michie 1998); 215 ILL.COMP STAT ANN. 5/143 (West Supp.1998); IND.CODE ANN § 22–3–5–5 (Michie 1997); IOWA CODE ANN. § 515.109 (West 1998); KAN.STAT.ANN § 40–216 (Supp.1999); KY REV.STAT. ANN § 304.14–120 (Michie 1996); LA REV.STAT ANN. § 23:1161 (West 1998); ME.REV.STAT.ANN. tit. 24–A, § 2412 (West 2000); MD.CODE ANN., INS. § 11–206 (1997); MASS.GEN.LAWS ANN. ch. 175, § 2B (West 1998); MICH STAT.ANN. § 24.12236 (Michie 1994); MINN.STAT ANN § 70A.06 (West 1999); MISS.CODE ANN. § 83–2–7 (1999); MO ANN STAT § 379.321 (West 1991 & Supp.2000); MONT. CODE ANN § 33–1–501 (1999); NEB.REV.STAT. § 48–146 (1998); NEV.REV.STAT.ANN. § 686B.070 (Michie 1997); N.H.REV STAT ANN. § 412:2 (1998); N.M.STAT ANN § 59A–18–12 (Michie 1995); N.Y.INS.LAW § 2307 (McKinney 1985 & Supp. 2000); N.C.GEN.STAT §§ 58–36–55 & –41–50 (1994 & Supp.1997); OKLA.STAT.ANN. tit. 36, § 3610 (West 1999); OR REV STAT. § 737.265 (1995); 40 PA CONS.STAT ANN § 477b (West 1999); R.I.GEN.LAWS § 27–7.1–2 (1998); S.C.CODE ANN. § 38–61–10 (Law.Co-op.1989); S.D.CODIFIED LAWS § 58–11–12 (Michie 1996); TENN.CODE ANN. § 56–5–306 (1994); TEX.INS.CODE ANN. § 5.35 (Vernon 1999); UTAH CODE ANN § 31A–21–201 (1999); VT. STAT ANN. tit. 8, § 4201 (1993); VA.CODE ANN. § 38.2–2014 (Michie 1999); WASH.REV.CODE ANN. § 48.18.100 (West 1999); WIS.STAT ANN § 631.20 (West 1995); *see also Wal–Mart Stores, Inc. v. Crist*, 855 F.2d 1326, 1333 (8th Cir.1988) ("all states … require that insurers file their … policy forms for review by state authorities").

**15.** ALA.CODE § 27–14–8 (1986); ALASKA STAT. § 21.42.120 (Michie 1998); ARIZ REV.STAT ANN

**16.** Although some premium factors for Option V policies are negotiable, tax multipliers and resid-

Finally, minor variations in state laws, e.g., numerical differences among state rates, do not prevent certification. Other federal courts have certified nationwide class actions in cases where the existence of RICO liability depended in one way or another on state laws or state imposed fees that varied from place to place.[17]

Wall Street has demonstrated, by calculating its own proper rates and by identifying the computer databases possessed by NCCI and Defendants, that it is an administrative matter to apply the proper rates to class members' coverages. Unlike the situation in *Castano*, variations in state law will not "swamp" the Court in the instant case.

### b. *Proximate Cause & Injury*

(1) Under *Summit Properties Inc. v. Hoechst Celanese Corp.*, Wall Street may establish proximate cause by either the "target wing" or "reliance wing."

■ Defendants argue that a trial of class claims is impossible due to the predominance of individualized issues. RICO's language that a person be "injured in his business or property by reason of a violation of 1962" requires both "but for" and "proximate" causation. *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 265–66, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). The Fifth Circuit discussed these causation requirements in *Summit Properties Inc. v. Hoechst Celanese Corp.*, 214 F.3d 556, 558–61 (5th Cir.2000).

■ Under *Summit*, proximate cause in a RICO fraud case is established if the plaintiff "has *either* been the target of a fraud ["target wing"] *or* has relied upon the fraudulent conduct of defendants ["reliance wing"]." *Summit*, 214 F.3d at 561 (emphasis added). The Fifth Circuit recently reaffirmed the independence of the target wing of *Summit*, stating that a third party's reliance upon a fraudulent statement can serve to establish proximate cause where it causes injury to the plaintiff. *Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 564–65 (5th Cir.2001) (reversing the dismissal of a RICO claim where Procter & Gamble alleged injury because its customers relied on defendants' misrepresentations). Here, Wall Street has stated a claim under both the target and reliance wings of *Summit*.

### (a) "Target Wing" (Fraud–on–the–Regulator Theory)

■ Under the target wing of *Summit*, reliance by the class members is not an issue. *See Procter & Gamble*, 242 F.3d at 565. Reliance upon a fraudulent representation or omission by a third person—here, regulators—is sufficient to state a RICO claim if the plaintiff is injured as a result. *Id.; see also Shaw v. Rolex Watch, U.S.A., Inc.*, 726 F.Supp. 969, 972–73 (S.D.N.Y.1989) (plaintiff injured by defendant's deceit of the U.S. Customs Department).[18] Thus, Wall Street may establish proximate cause by establishing that the class members were injured by the regulators' reliance on Defendants' misrepresentations and omissions.

This Court previously analyzed the issue of proximate cause and concluded that, under the "target wing" of the Fifth Circuit's decision in *Summit*, Wall Street's "allegations of

---

ual market subsidies are fixed by law. Wall Street only complains about the deviations from these fixed rates, not negotiable rates.

**17.** *See In re Consol. "Non–Filing Ins." Fee Litig.*, 195 F.R.D. 684 (M.D.Ala.2000) (nationwide class where damages depended upon varying state UCC–1 filing fees); *Sikes v. AT & T*, 179 F.R.D. 342 (S.D.Ga.1998) (certifying a nationwide class alleging RICO violations in connection with telephone gambling game, where the occurrence of a violation turned on whether the game violated the gambling laws of the states where it was played).

**18.** Other circuits have accepted the target analysis, particularly where a fraud is perpetrated on a regulator for the purpose of defrauding a protected class. *See, e.g., Rodriguez v. McKinney*, 156 F.R.D. 112 (E.D.Pa.1994) (certifying class of vocational school students where defendant misrepresented the ability of the students to benefit from the program to the Department of Education); *see also United States v. Cavin*, 39 F.3d 1299 (5th Cir.1994) (defendant defrauded Alliance policyholders by misrepresentations to the Commissioner of Insurance); *Learjet Corp. v. Spenlinhauer*, 901 F.2d 198 (1st Cir.1990) (buyer of airplane defrauded by aircraft manufacturer's misrepresentations to the Federal Aviation Administration); *United States v. Olatunji,*, 872 F.2d 1161, 1167 (3rd Cir.1989) (Department of Education defrauded by defendants' false statements to the Immigration and Naturalization Services).

fraud, through the scheme to collect excessive workers' compensation premiums, [are] sufficient to satisfy RICO after *Summit.*" *Sandwich Chef,* 111 F.Supp.2d at 876 ("Wall Street's fraud-on-the-regulator [theory] is cognizable as a RICO claim after *Summit* because Wall Street has established through the summary judgment evidence that the defendants engaged in a scheme to collect phantom premiums through misrepresentations made to insurance regulators.").

As argued by Wall Street, evidence at the certification hearing provided further details of the foundation for Wall Street's fraud-on-the-regulator allegations. When NCCI made its R–1244 filing (seeking authority for residual market subsidies in filed rates), it represented that the costs of the residual market pools were not currently considered in Defendants' filed rates. The filing concealed that many Defendants were already charging these costs to policyholders. R–1244 also stated that Defendants intended only a "partial pass-through" of these costs when representatives of several Defendants testified that, at the time, they intended to, and did, charge their policyholders a full pass-through. Wall Street alleges that R–1244, at best, was a representation that was a half-truth, intended to mislead regulators and furthered Defendants' overcharge scheme by concealing material facts from state regulators.[19] In addition to NCCI's misrepresentations and omissions, Wall Street contends that individual Defendants made similar deceitful representations directly to regulators.

According to Wall Street, the alleged purpose of the fraudulent filings was to mislead regulators to believe that Defendants were complying with the filed rates. Wall Street asserts that the filings, both for the overall plan rates and the individual policyholders plan rates, failed to disclose that Defendants would charge additional unfiled charges; moreover, the overall plan rate filings, such as R–1244, falsely stated or implied to regulators that Defendants intended to comply with the filed rates.

Despite the foregoing analysis, Defendants argue that the necessity of showing injury through individual proof defeats class certification. The Court disagrees. Under the target wing, Wall Street may first show that the regulators relied upon the filings and would have enforced the filed rates. Defendants have not argued that regulators failed to enforce the filed rates. The alleged conduct of Defendants, if proved, would show that they understood it was necessary to conceal their actual charges by making deceitful filings in violation of state laws.[20] The impact of Defendants' alleged scheme therefore affects all class members the same.

The "target wing" claim based on Wall Street's fraud-on-the-regulator theory is a common issue faced by all class members that may be proved or disproved at trial from

---

**19.** *See* Fifth Circuit Pattern Jury Instructions, Civil 8.1 at 85 (West 1999) ("A statement or representation may also be 'false' or 'fraudulent' if it constitutes a half truth, or effectively conceals a material fact, with the intent to defraud.")

**20.** All jurisdictions prohibit Defendants from making false or misleading filings or other statements to state regulators. Ala.Code § 27–13–77 (1986); Alaska Stat. § 21.39.140 (Michie 1998); Ariz.Rev.Stat Ann. § 20–372 (West Supp.1999); Colo.Rev.Stat. § 10–4–417 (1999); Conn.Gen.Stat Ann. § 38a–679 (West 1992); Del Code Ann tit. 18, § 2528 (1989 & Supp.1996); D.C.Code Ann. § 22–3825.2 (1997); Fla.Stat.Ann § 627.361 (West Supp.2000); Ga.Code Ann. § 33–9–35 (1996); Haw.Rev.Stat.Ann. § 431:14–115 (Michie 1994); Idaho Code § 41–1431 (Michie 1998); 215 Ill.Comp.Stat Ann 5/467 (West Supp.1998); Ind.Code Ann § 27–1–22–17 (Michie 1997); Iowa Code Ann. § 515A. 14 (West 1998); Kan.Stat.Ann § 40–1119 (Supp.1999); Ky.Rev Stat Ann. § 304.47–020 (Michie 1996); La.Rev.Stat.Ann. § 22:1416 (West 1998); Me.Rev.Stat Ann. tit. 24–A, § 2326 (West 2000); Md Code Ann., Ins. § 11–231 (1997); Mass. Gen.Laws Ann. ch. 174A, § 16 (West 1998); Mich Stat Ann. § 500.2474 (Michie 1994); Minn.Stat. Ann § 70A.20 (West 1999); Miss.Code Ann. §§ 83–5–35 & 85–5–67 (1999); Mo.Ann.Stat. § 379.353 (West 1991 & Supp.2000); Mont.Code Ann § 33–16–107 (1999); Neb.Rev Stat. § 44–5034 (1998); Nev.Rev.Stat Ann. § 686B.1797 (Michie 1997); N.H.Rev Stat.Ann. § 413:8 (1998); N.M.Stat.Ann. § 59A–17–31 (Michie 1995); N.Y.Ins.Law § 2315 (McKinney 1985 & Supp. 2000); N.C.Gen.Stat § 58–40–45 (1994 & Supp. 1997); Okla.Stat.Ann. tit. 36, § 935 (West 1999); Or.Rev.Stat. § 737.535 (1995); 40 Pa Cons.Stat. Ann. § 1194 (West 1999); R.I.Gen Laws § 27–6–45 (1998); S.C.Code Ann § 38–73–80 (Law.Co-op.1989); S.D.Codified Laws § 58–24–34 (Michie 1996); Tenn.Code Ann. § 56–47–104 (1994); Tex Ins.Code Ann. § 5.21 (Vernon 1999); Utah Code Ann. § 31A–19a–215 (1999); Vt.Stat.Ann. tit. 8, § 4724 (1993); Va.Code Ann. § 38.2–1927 (Michie 1999); Wash.Rev Code Ann. § 48.19.390 (West 1999); Wis Stat Ann. § 895.486 (West 1995).

a common set of facts under a single federal law. The Court thus finds that Wall Street has established predominance and superiority for its "target wing" claim.

(b) "Reliance Wing" (Invoice Theory)

The next issue is whether Wall Street can prove proximate cause under *Summit's* reliance wing for its invoice theory without requiring individualized proof of reliance. Under Rule 23(b)(3), district courts must examine questions of individualized proof in light of the elements of the cause of action and the applicable defenses. *Patterson v. Mobil Oil Corp.,* 241 F.3d 417, 419 (5th Cir. 2001); *Bolin v. Sears, Roebuck & Co.,* 231 F.3d 970, 976 (5th Cir.2000).

The Fifth Circuit has overruled orders certifying (b)(3) classes in cases where the facts required individual proof of reliance that would "defeat the economics ordinarily associated with the class action device." *Patterson,* 241 F.3d at 419; *see also Bolin,* 231 F.3d at 978;[21] *Castano,* 84 F.3d at 745. The proposed classes in *Castano, Bolin* and *Patterson* were unsuitable for certification due to the multiplicity of individual issues presented by each claimant. *Castano* involved mass tort claims for personal injuries, economic losses, emotional distress, and wanton or reckless conduct under the varying laws of the fifty states. *Castano,* 84 F.3d at 734. *Bolin* involved "holistic" certification of numerous claims for consequential losses incurred as a result of the defendant's alleged illegal collection practices, such as hiring attorneys to defend litigation brought by the defendant. *Bolin,* 231 F.3d at 978. In *Patterson,* to establish reliance "each plaintiff would have to make an individual showing that she could have and would have sued Mobil, but did not do so because the asserted false statements led her to believe her suit to be barred by the workers' compensation regime." *Patterson,* 241 F.3d at 419.

Wall Street's invoice theory claim is simple in contrast to the claims pursued in *Patterson, Bolin* and *Castano;* moreover, its claim has not been directly addressed by the Fifth Circuit. Wall Street's claim concerns only direct, not consequential, economic injury for conduct that falls within RICO's statute of limitations. The injury to each class member is the same: an alleged overcharge resulting from an inflated invoice. Everything needed to measure the injury for the class, as well as for each class member, can be found in Defendants' records. Wall Street's invoice theory claim thus does not raise the many complicating factors that have defeated Rule 23(b)(3) certification in other cases.[22]

Further, Wall Street's invoice theory claim alleges only one type of direct misrepresentation by Defendants to the policyholders: written invoices.[23] Wall Street contends that Defendants inflated their invoices pursuant to the scheme. Wall Street argues that each invoice containing phantom premiums (overcharges) was an affirmative misrepresentation of the amount lawfully due. Wall Street believes that the invoices failed to disclose that Defendants had not made the necessary filings to allow the deviant charges. Absent such filings, Defendants could not lawfully charge the amount invoiced.

Wall Street also submits that these invoices constitute classic mail fraud.[24] Wall

21. In *Bolin,* the Fifth Circuit's statement regarding (b)(3) certification was not dispositive of the case, as only (b)(2) certification was before the court. The Fifth Circuit appears to have adopted the (b)(3) ruling, however, by its statement in *Patterson. See Patterson,* 241 F.3d at 419 (stating that "[in *Bolin* ], we held that 'the individual findings of reliance necessary to establish RICO liability and damages preclude not only (b)(2) certification of this class under RICO, but (b)(3) certification as well' ").

22. Furthermore, as addressed in the parties' pleadings and by Wall Street during the class certification hearing, several of the Defendants in the instant action were defendants in *Weatherford Roofing Co. v. Employers National Insurance Co.,* Cause No. 91–05637–F, in the 116th Judicial

District Court of Dallas County, Texas. *Weatherford* was similar to the instant suit, in that it alleged that insurance carriers charged policyholders higher than approved rates for retrospectively rated workers' compensation insurance. The case settled on a class basis with court approval.

23. The complaint alleges no oral misrepresentations, which distinguishes this case from those cited by Defendants for the proposition that individualized proof of fraud is necessary.

24. The fraud element for mail fraud involves a violation of "fundamental honesty, fair play and right dealing." *Gregory v. United States,* 253 F.2d 104, 109 (5th Cir.1958).

Street asserts that, pursuant to the filed rate doctrine, the policyholder did not owe more than the filed rate at the time the invoices were sent. Wall Street also presented evidence that Defendants knowingly sent policyholders invoices that Defendants knew were higher than the filed rates at the time the invoices were sent and that these practices were established in Defendants' manuals.

The Fifth Circuit has *not* held that a RICO fraud class action may never be maintained under Rule 23(b)(3). A holding that a RICO fraud class action may never be maintained would be contrary to the Supreme Court's observation in *Amchem* that class action requirements are "readily met in certain cases alleging consumer or securities fraud." *Amchem*, 521 U.S. at 625, 117 S.Ct. 2231.[25]

Furthermore, class certification is particularly appropriate when purchasers seek redress for widespread commercial abuses. *Alabama v. Blue Bird Body Co., Inc.*, 573 F.2d 309, 320 (5th Cir.1978) (price-fixing conspiracies "are particularly suited for class action treatment"). In this case, individualized proof of reliance is not an obstacle to class certification because the act of payment of invoices may establish circumstantial evidence of reliance.[26]

 In a RICO fraud case alleging overcharges, proximate cause (reliance and injury) can be proved by circumstantial evidence of the transaction that resulted in the overcharge. In *Chisolm v. TranSouth Financial Corp.*, 194 F.R.D. 538, 567 (E.D.Va.2000), the district court held that payments of excessive charges themselves proved detrimental reliance. *Chisolm*, 194 F.R.D. at 560 (citing *Chevalier v. Baird Sav. Ass'n*, 72 F.R.D. 140, 149 (E.D.Pa.1976) (payment of excessive interest charges was sufficient to show Sherman Act impact)). Here, Wall Street argues that the circumstances in the instant case

compel a finding of reliance by means of circumstantial evidence—namely, proof that the invoices contained material misrepresentations (i.e., inflated premiums) and that the class members paid overcharges in reliance upon such invoices.

Defendants challenge that *Chisolm* is predicated upon the "fraud on the market" theory that the Fifth Circuit rejected in *Summit*. However, while *Chisolm* mentioned the fraud on the market theory, it did not rely on it. *Chisolm*, 194 F.R.D. at 560. The *Chisolm* court acknowledged that "[p]resumed reliance under civil RICO is generally disfavored outside of certain narrow contexts." *Id.* The court noted that it was not presuming reliance, but was instead concluding that reliance was proved for all class members by circumstantial proof. *Id.* at n. 24 (quoting *Todd v. Sykes*, 97 Va. 143, 33 S.E. 517, 519 (1899)) ("A transaction may itself and by itself furnish the most satisfactory proof of fraud, so conclusive as to outweigh the answer of the defendant and even the evidence of witnesses."). Given the conduct at issue in *Chisolm*, the court held that no reasonable person could conclude other than that the class members relied upon the invoices by paying them. *Id.* at 561–62.

The use of circumstantial evidence to prove reliance is well-established. *Vasquez v. Superior Court*, 4 Cal.3d 800, 94 Cal.Rptr. 796, 484 P.2d 964, 972 (1971) (observing the rule in California "and elsewhere that it is not necessary to show reliance upon false representations by direct evidence"). "Circumstantial evidence [of reliance under common law fraud] is not only sufficient, but in most cases it is the only proof that can be adduced." *Cook v. Hayden*, 183 Va. 203, 31 S.E.2d 625 (1944). Indeed, inferences from circumstances surrounding a transaction may be stronger and more satisfactory evidence

**25.** The Court also notes that other district courts have allowed class actions to proceed on claims that require proof of reliance. *See In re Consol. "Non–Filing Ins." Fee Litig.*, 195 F.R.D. 684, 692 (M.D.Ala.2000); *Chisolm v. TranSouth Fin. Corp.*, 194 F.R.D. 538, 567 (E.D.Va.2000); *Sikes v. AT & T*, 179 F.R.D. 342, 356 (S.D.Ga.1998); *Rodriguez v. McKinney*, 156 F.R.D. 112, 118 (E.D.Pa.1994).

**26.** The Court declines to adopt Wall Street's alternative methods of proving reliance—i.e., "pre-

sumed reliance" and "the *Ute* presumption" based upon *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). *See, e.g., Chisolm*, 194 F.R.D. at 560 n. 24 (noting that presumed reliance is generally disfavored in civil RICO); *see also Buford v. H & R Block, Inc.*, 168 F.R.D. at 359 n. 8 (determining that *Ute* reliance does not reach beyond § 10b–5 actions); *cf. Perrone v. Gen. Motors Acceptance Corp.*, 232 F.3d 433, 439 (5th Cir. 2000) (rejecting the *Ute* presumption in TILA case).

than direct testimony. *Vasquez,* 94 Cal.Rptr. 796, 484 P.2d at 972. "[I]f . . . the trial court finds misrepresentations were made to the class members, at least an inference of reliance would arise as to the entire class." *Id.* at 973.

In addition to *Chisolm* and *Vasquez,* the Northern District of Texas recently relied on *Vasquez* and applied its reasoning. *See In re Great S. Life Ins. Co. Sales Practices Litig.,* 192 F.R.D. 212, 220 (N.D.Tex.2000). While recognizing that *Vasquez* applied to misrepresentations, the district court applied its rationale to omissions. *Id.* Here, Wall Street has pleaded that class members were presented invoices with inflated premiums that constitute misrepresentations, omissions or both. Wall Street alleges that the invoices were material and that, in reliance upon these invoices, the class members paid overcharges. Based on *Chisolm, Vasquez* and *In re Great Southern,* the Court determines that Wall Street and the class are entitled to use the invoices and payment of the invoices as circumstantial evidence of detrimental reliance.[27] Furthermore, Wall Street may present expert witness testimony that businesses customarily and reasonably rely on the accuracy of invoices, especially invoices sent by regulated entities, and that commercial transactions between businesses occur based on an ethic of honesty and fair dealing.[28]

### c. Counterclaim Issue

■ Defendants further argue that the class should not be certified because absent class members will be subject to compulsory counterclaims arising from alleged undercharges. Defendants contend that they undercharged many putative class members for workers' compensation insurance and provided these members with financial benefits

that differed from, and were in addition to, the benefits provided under filed rate programs. Defendants argue that the employers and insurers engaged in highly customized and individually negotiated transactions, underscoring the need for individualized adjudications involving multiple state laws. Defendants state that these circumstances evidence incurable conflicts between Wall Street and its putative class members who will be exposed to significant counterclaims from their insurers. The parties provided additional briefing on this issue which the Court has reviewed. Having considered the impact of such threatened counterclaims on certification, *see George v. Beneficial Fin. Co. of Dallas,* 81 F.R.D. 4, 6–7 (N.D.Tex. 1977), the Court determines that the counterclaim issue does not bar certification under these circumstances.

As an initial matter, Defendants' threats of undercharge counterclaims against absent class members are properly characterized as speculative. Approximately one month before the class certification hearing, Defendant Reliance filed its counterclaim against Wall Street. The counterclaim asserts a cause of action for breach of contract based upon Wall Street's alleged failure to pay workers' compensation premiums, as well as automobile and general liability insurance premiums.[29] However, the breach of contract counterclaim—based upon nonpayment of insurance premiums—is hardly the same as Defendants' threats of counterclaims based upon alleged *undercharges.* Defendants argue that they are entitled to undercharges from absent class members because the insureds financially benefitted from negotiated insurance programs; yet Reliance's actual, pending counterclaim against the only named plaintiff is devoid of any cause of action based upon such undercharges.[30]

---

27. Defendants assert that the Fifth Circuit in *Patterson* rejected reliance based on circumstantial evidence of the conduct of class members. *Patterson,* however, neither addresses nor rejects *Chisolm* or the use of circumstantial evidence of reliance.

28. *See Rodriguez,* 156 F.R.D. at 117 (plaintiff may "use expert testimony to develop the inference that a student otherwise unable to afford an education is induced to enroll in school by being offered a student loan").

29. By Order entered on the same date as this opinion, the Court has severed Defendant Reliance's automobile and general liability insurance premium counterclaim from this action. The workers' compensation premium counterclaim remains in the suit.

30. In its recitation of facts in its first amended counterclaim, Reliance asserts that Wall Street "benefitted substantially from the insurance coverage provided by Reliance." However, its breach of contract claim relies solely upon Wall Street's alleged failure to pay premiums.

Furthermore, because absent class members are not "parties," they are not subject to compulsory counterclaims. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 810, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985) ("absent plaintiff class members are almost never subject to counterclaims or cross-claims, or liability for fees or costs"); *Transamerican Refining Corp. v. Dravo Corp.*, 139 F.R.D. 619, 621 (S.D.Tex.1991) ("absent class members are not parties within the meaning of Rule 23"); *see also Buford v. H & R Block, Inc.*, 168 F.R.D. 340, 363–64 (S.D.Ga. 1996); *see generally* 1 HERBERT B. NEWBERG AND ALBA CONTE, NEWBERG ON CLASS ACTIONS § 4.34 (3d ed. 1992 & Supp.2001).[31]

As the Fifth Circuit stated in *Roper v. Consurve, Inc.*, "potential assertion of counter claims against these few members of the proposed class cannot be allowed to defeat an otherwise valid class action when to do so would effectively deprive thousands of class members of the relief to which they are entitled." *Roper v. Consurve, Inc.*, 578 F.2d 1106, 1116 (5th Cir.1978), *aff'd on other grounds*, 445 U.S. 326, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980). Here, Defendants' speculative undercharge counterclaims do not constitute a legitimate bar to certification, based on the Fifth Circuit's statement in *Roper. See id.*

Moreover, the counterclaim issue does not make the case unmanageable at trial. First, Wall Street's Trial Plan addresses and manages the counterclaim issue.[32] Second, the Court has the authority to sever such counterclaims, if they arise. Third, jury instructions may be crafted so as to eliminate juror confusion regarding the effect of such counterclaims. Accordingly, the Court determines that Defendants' allegations of potential counterclaims do not bar certification in this case.

### d. Materiality

Defendants suggest that Wall Street cannot establish materiality of the invoices sent to policyholders on a class-wide basis. Invoices that charge phantom premiums are material if a reasonable person would attach importance to them. *See* RESTATEMENT (SECOND) OF TORTS § 538(2)(a) (1976).[33] Because this standard is an objective one, there is no need for individual evidence from policyholders as to whether they found the inflated bill to be material. The jury need only decide if a reasonable business would attach importance to such invoices. "The law is well settled that materiality can be proven class wide." *Waters v. Int'l Precious Metals Corp.*, 172 F.R.D. 479, 503 (S.D.Fla.1996). The Court therefore finds that materiality is a common issue that predominates in this case.

### e. Defenses

Defendants also argue that their defenses bar certification. First, Defendants argue that the statute of limitations creates individual issues. The Court disagrees. The start date for Wall Street's class excludes policies closed by a final premium adjustment beyond the statute of limitations. In *Love v. National Medical Enterprises*, 230 F.3d 765 (5th Cir.2000), the Fifth Circuit adopted the "separate accrual" rule, wherein every fraudulent invoice mailed within four years of the filing of Wall Street's original complaint is a separate injury within the limitations period. *See Love*, 230 F.3d at 774–75. Therefore, the

---

**31.** Defendants argue that *Heaven v. Trust Co. Bank*, 118 F.3d 735 (11th Cir.1997), supports denial of certification on this issue. *Heaven* is distinguishable from the instant case because the plaintiff, asserting a TILA claim, conceded that a debt counterclaim was in fact a compulsory counterclaim under existing law. *Heaven*, 118 F.3d at 737. There is clearly no such concession by Wall Street in this case. In fact, Wall Street questions whether an undercharge counterclaim will be asserted; to date, none has been filed. Wall Street also correctly points out that *Heaven* did not address the issue of whether unnamed class members are "opposing parties." *See Selby v. Principal Mut. Life Ins. Co.*, No. 98 CIV 5283, 2000 WL 1863760, at *7 (S.D.N.Y. Dec.20, 2000).

**32.** *See* Section II(B) (Phase 1) (Step 6) *supra.*

**33.** This section of the RESTATEMENT was quoted by the Supreme Court in defining "materiality" in the federal mail fraud statute. *Neder*, 527 U.S. at 22 n. 5, 119 S.Ct. 1827. The Court further held that "a false statement is material if it has a natural tendency to influence, or [is] capable of influencing the decision of the decision making body to which it was addressed." *Id.* at 16, 119 S.Ct. 1827 (quoting *Kungys v. United States*, 485 U.S. 759, 770, 108 S.Ct. 1537, 99 L.Ed.2d 839 (1988)).

statute of limitations defense does not preclude certification of this class.

Defendants also assert that the equitable defense of *in pari delicto,* pursuant to the formulation set forth in *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985), presents individual issues that prevent certification. Under the *Bateman Eichler* test:

[A] private action for damages … may be barred on the grounds of the plaintiff's own culpability only where (1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of suit would not significantly interfere with the effective enforcement of the securities laws and protection of the investing public.

472 U.S. at 310–11, 105 S.Ct. 2622. The *Bateman Eichler* test has been applied to RICO claims. *Florida Software Sys. v. Columbia/HCA Healthcare Corp.,* No. 97–2866–Civ–T–17B, 1999 WL 781812, at *2 (M.D.Fla. 1999); *Bieter v. Blomquist,* 848 F.Supp. 1446, 1449 (D.Minn.1994).

■ "Plaintiffs who are truly *in pari delicto* are those who have themselves violated the law in cooperation with the defendant." *E.g., Pinter v. Dahl,* 486 U.S. 622, 636, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988) (internal quotations omitted). "Unless the degrees of fault are essentially indistinguishable or the plaintiff's responsibility is clearly greater, the *in pari delicto* defense should not be allowed, and the plaintiff should be compensated." *Id.*

The RICO cases addressing *in pari delicto* arise from allegations that the plaintiff was involved in the racketeering conduct. *See, e.g., id.* No evidence of any class member's involvement in the alleged scheme was presented to this Court in the certification hearing. Defendants do not argue that any class member participated in the alleged scheme to corrupt NCCI, to make false rate filings, or to prepare deceitful invoices. Accordingly, the *in pari delicto* defense does not prohibit certification.

#### f. Arbitration Agreements

■ Defendants argue that class certification is improper because some class members have arbitration agreements with some Defendants. Wall Street is the only party to this proceeding. Its policies with Reliance do not contain arbitration clauses; further, no arbitration agreements exist between Wall Street and other carriers.

Additionally, Defendants' arbitration agreements are not filed in any jurisdiction for use with workers' compensation insurance. More importantly, these agreements were not made part of any policy by endorsement. The merger clause of the filed policy, eliminating any agreement not endorsed to the policy, renders the arbitration agreement immaterial to the determination of premiums.

Moreover, it is questionable whether Defendants can invoke the Federal Arbitration Act ("FAA") to enforce the arbitration agreements controlling workers' compensation premiums. The McCarran–Ferguson Act preempts federal laws that may invalidate, impair or supersede the states' regulation of the business of insurance. 15 U.S.C. § 1012(b) (1994). Because the states regulate workers' compensation premiums through filed rates and forms, the use of these agreements may "invalidate, impair or supersede" the regulation of insurance. Courts have not hesitated to preempt the FAA when it impairs state law regulating insurance.[34] One federal district court has expressed concern about whether Defendant Home Insurance Company's arbitration agreement could be allowed to supersede the terms contained in the approved policy.[35]

---

**34.** *See, e.g., Davister Corp. v. United Republic Life Ins. Co.,* 152 F.3d 1277 (10th Cir.1998) (holding FAA reverse preempted by state statute under McCarran–Ferguson); *Munich Am. Reinsurance Co. v. Crawford,* 141 F.3d 585 (5th Cir.1998) (holding FAA reverse preempted by state statute under McCarran–Ferguson); *Washburn v. Corcoran,* 643 F.Supp. 554 (S.D.N.Y.1986) (holding FAA reverse preempted by state statute under McCarran–Ferguson).

**35.** *In re Home Indem. Co.,* No. 94 CIV. 3173, 1994 WL 557068, at *1 (S.D.N.Y. Oct.11, 1994) ("Moreover, it is questionable whether the Arkansas statute would be read to permit its protection of policyholders to be evaded by this stratagem of putting premium provisions in a separate agreement.").

Finally, even if a Defendant validly invokes the arbitration agreements, the agreements will not materially affect the RICO class-wide claims. Nor can an arbitration clause govern any class member's RICO claim against any Defendant other than the carrier that issued its policy. Consequently, arbitration clauses do not provide a basis to prevent Wall Street from litigating RICO claims for each class member against all non-issuing Defendants. Because each policyholder is entitled to recover in full from each Defendant found to have participated in the alleged conspiracy to overcharge, Defendants' arguments relating to arbitration agreements are not a barrier to certification.[36]

In addition to the foregoing, the Court believes class treatment is superior due to the existence of Wall Street's Trial Plan as described in Section II(B) *supra.* At this juncture, the Court declines to formally adopt Wall Street's Trial Plan. Nevertheless, the Court is influenced by the existence of such a thorough plan for trying this class action to the extent of deeming the class manageable.[37] Defendants urge that the proof required in this trial would focus on the knowledge of thousands of individuals who participated in the negotiation of insurance policies, and that individual issues concerning these transactions will make trial unmanageable. The Court believes that Wall Street has sufficiently addressed such concerns through the steps outlined in its Trial Plan.

In closing, the Court is of the opinion that a class action—rather than innumerable individual actions—is the better method of litigating this dispute. Keeping in mind the existence of Wall Street's Trial Plan to manage the case, the Court's ability to divide the class into subclasses at a later date if appropriate,[38] and the appointment of a special master if warranted,[39] the Court determines that the motion for certification should be granted. Given the foregoing, the Court hereby

ORDERS that Wall Street's motion for class certification of a class consisting of:

All purchasers (excluding policyholders with a captive insurance company that ultimately reinsure their workers' compensation risk, the defendants and co-conspirators) of workers' compensation insurance policies, effective on or after January 1, 1987, endorsed with a Retrospective Premium Endorsement (NCCI form WC 00 05 series) and not closed by a final premium calculation on or before May 6, 1994, excluding purchasers of policies endorsed as a Large Risk Alternative Rating Option

is GRANTED.

---

**36.** The Court may also divide the class into subclasses based on such arbitration agreements if the need arises. *See* Fed R.Civ.P. 23(c)(4).

**37.** Furthermore, the Fifth Circuit has stated that "[a]nother consideration in favor of finding predominance is that if the defendants prevail on the liability issues, damages will be moot." *Bertulli,* 242 F.3d at 298 n. 37 (citing *Mullen,* 186

F.3d at 626). Here, as demonstrated in Wall Street's Trial Plan, if defendants prevail on liability, the damage calculation issue will be moot. Accordingly, this weighs in favor of finding the class manageable. *See id.*

