IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

NO. 01-20924
_____

SANDWICH CHEF OF TEXAS, INC., doing business as Wall Street
Deli, Individually and for Others Similarly Situated,

Plaintiff-Appellee,

versus

RELIANCE NATIONAL INDEMNITY INSURANCE COMPANY, formerly known as Planet
Insurance Company; RELIANCE INSURANCE COMPANY; RELIANCE LLOYDS;
RELIANCE NATIONAL INSURANCE CO.; UNITED PACIFIC INSURANCE CO.; HOME
INSURANCE COMPANY, formerly known as City Insurance Co., formerly known as Home
Indemnity Company, formerly known as Home Insurance Company, formerly known as Home
Insurance Company of Indiana; LIBERTY MUTUAL INSURANCE COMPANY; LIBERTY
MUTUAL FIRE INSURANCE COMPANY; LIBERTY INSURANCE CORPORATION;
AMERICAN & FOREIGN INSURANCE COMPANY; GLOBE INDEMNITY CO.; ROYAL
INDEMNITY CO.; ROYAL INSURANCE COMPANY OF AMERICA; SAFEGUARD
INSURANCE CO.; BITUMINOUS CASUALTY CORPORATION; BITUMINOUS FIRE AND
MARINE INSURANCE CO.; GREAT WEST CASUALTY INSURANCE CO.;
INTERNATIONAL BUSINESS & MERCANTILE REASSURANCE CO.; OLD REPUBLIC
INSURANCE COMPANY; NORTH RIVER INSURANCE CO.; INTERNATIONAL
INSURANCE COMPANY; WESTCHESTER FIRE INSURANCE COMPANY; UNITED
STATES FIRE INSURANCE COMPANY; UNITED STATES FIDELITY AND GUARANTY
COMPANY; FIDELITY & GUARANTY INSURANCE UNDERWRITERS INC;
INDUSTRIAL INDEMNITY; CHUBB INDEMNITY INSURANCE CO.; CHUBB LLOYDS
INSURANCE CO. OF TEXAS; FEDERAL INSURANCE COMPANY; GREAT NORTHERN
INSURANCE CO.; NORTHWESTERN PACIFIC INDEMNITY CO.; PACIFIC INDEMNITY
COMPANY; SUN INSURANCE OFFICE OF AMERICA INC; TEXAS PACIFIC
INDEMNITY CO.; VIGILANT INSURANCE CO.; HIGHLANDS INSURANCE COMPANY;
HIGHLANDS UNDERWRITERS INSURANCE CO.; HIGHLANDS CASUALTY CO.;
ABERDEEN INSURANCE CO.; BANKERS STANDARD INSURANCE CO.; CENTURY
INDEMNITY CO.; INDEMNITY INSURANCE COMPANY OF NORTH AMERICA;
INSURANCE COMPANY OF NORTH AMERICA; PACIFIC EMPLOYERS INSURANCE
COMPANY; ATLANTIC INSURANCE CO.; AUTOMOBILE INSURANCE COMPANY OF
HARTFORD CONNECTICUT; CHARTER OAK FIRE INSURANCE COMPANY;

FARMINGTON CASUALTY CO.; GULF GROUP LLOYDS; GULF INSURANCE CO.; NIPPON FIRE/MARINE INSURANCE CO. LTD., U S Branch; PHOENIX INSURANCE COMPANY; SELECT INSURANCE CO.; STANDARD FIRE INSURANCE CO.; TRAVELERS CASUALTY & SURETY CO., formerly known as Aetna Casualty & Surety Co.; TRAVELERS CASUALTY & SURETY COMPANY OF AMERICA, formerly known as Aetna Casualty and Surety Company of America; TRAVELERS CASUALTY & SURETY COMPANY OF ILLINOIS, formerly known as Aetna Casualty & Surety Company of Illinois; TRAVELERS INDEMNITY COMPANY; TRAVELERS INDEMNITY COMPANY OF AMERICA; TRAVELERS INDEMNITY COMPANY OF CONNECTICUT, THE, formerly known as Travelers Indemnity Company of Rhode Island; TRAVELERS INDEMNITY CO. OF ILLINOIS; TRAVELERS INSURANCE COMPANY; ARGONAUT INSURANCE COMPANY; ARGONAUT MIDWEST INSURANCE COMPANY; ARGONAUT SOUTHWEST INSURANCE COMPANY; AMERICAN HOME ASSURANCE COMPANY; BIRMINGHAM FIRE INSURANCE COMPANY OF PENNSYLVANIA; COMMERCE AND INDUSTRY INSURANCE CO.; GRANITE STATE INSURANCE COMPANY; ILLINOIS NATIONAL INSURANCE COMPANY; THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA; NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA; NEW HAMPSHIRE INSURANCE COMPANY; AMERICAN MANUFACTURING MUTUAL INSURANCE CO.; AMERICAN MOTORISTS INSURANCE COMPANY; AMERICAN PROTECTION INSURANCE CO.; LUMBERMENS MUTUAL CASUALTY COMPANY; EMCASCO INSURANCE CO.; EMPLOYERS MUTUAL CASUALTY COMPANY; FARMLAND MUTUAL INSURANCE CO.; NATIONWIDE AGRIBUSINESS INSURANCE CO.; NATIONWIDE INDEMNITY INSURANCE CO.; NATIONWIDE MUTUAL FIRE INSURANCE CO.; NATIONWIDE MUTUAL INSURANCE COMPANY; NATIONWIDE PROPERTY AND CASUALTY INSURANCE CO.; SCOTTSDALE INDEMNITY CO.; MIDDLESEX INSURANCE CO.; SENTRY INSURANCE, A Mutual Company; EMPLOYERS INSURANCE OF WAUSAU, A Mutual Company; WAUSAU BUSINESS INSURANCE CO.; WAUSAU UNDERWRITERS INSURANCE COMPANY; AGRICULTURAL INSURANCE CO.; AMERICAN ALLIANCE INSURANCE COMPANY; AMERICAN NATIONAL FIRE INSURANCE COMPANY; GREAT AMERICAN INSURANCE CO.; MID-CONTINENT CASUALTY COMPANY; AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA; CONTINENTAL CASUALTY COMPANY; NATIONAL FIRE INSURANCE COMPANY OF HARTFORD; TRANSCONTINENTAL INSURANCE COMPANY; TRANSPORTATION INSURANCE COMPANY; VALLEY FORGE INSURANCE COMPANY; BOSTON OLD COLONY INSURANCE COMPANY; CASUALTY INSURANCE COMPANY OF TEXAS; COMMERCIAL INSURANCE COMPANY OF NEWARK, NEW JERSEY; THE CONTINENTAL INSURANCE COMPANY; THE FIDELITY AND CASUALTY INSURANCE COMPANY NEW YORK; FIREMEN'S INSURANCE COMPANY OF NEWARK, NEW JERSEY; GLENS FALLS INSURANCE COMPANY; KANSAS CITY FIRE & MARINE INSURANCE CO.; NIAGARA FIRE INSURANCE CO.; AMERICAN GUARANTEE AND LIABILITY INSURANCE COMPANY; ZURICH INSURANCE COMPANY; REPUBLIC-FRANKLIN INSURANCE CO.; UTICA MUTUAL INSURANCE CO.; UTICA NATIONAL INSURANCE COMPANY OF TEXAS;

- 2 -

FAIRMONT INSURANCE CO.; TIG INSURANCE COMPANY OF TEXAS, formerly known as Transamerican Insurance Company of Texas; TIG PREMIER INSURANCE CO., formerly known as Transamerica Premier Insurance Company; ASSURANCE COMPANY OF AMERICA; MARYLAND CASUALTY CO.; MARYLAND INSURANCE CO., formerly known as American General Fire and Casualty Company; NORTHERN INSURANCE COMPANY OF NEW YORK; VALIANT INSURANCE CO.; AMERICAN AUTOMOBILE INSURANCE CO.; AMERICAN INS CO.; ASSOCIATED INDEMNITY CORP; FIREMAN'S FUND INSURANCE COMPANY; FIREMAN'S FUND INSURANCE COMPANY OF TEXAS; FIREMAN'S FUND INSURANCE COMPANY OF WISCONSIN; NATIONAL SURETY CORP; THE CONNECTICUT INDEMNITY COMPANY; FIRE & CASUALTY INSURANCE COMPANY OF CONNECTICUT; SECURITY INSURANCE COMPANY OF HARTFORD; ACE FIRE UNDERWRITERS INSURANCE COMPANY, formerly known as Cigna Fire Underwriters Insurance Company; ACE AMERICAN INSURANCE COMPANY, formerly known as CIGNA Insurance Company; ACE PROPERTY AND CASUALTY INSURANCE COMPANY, formerly known as CIGNA Property & Casualty Insurance Co.; TIG AMERICAN SPECIALTY INSURANCE CO., formerly known as Chilton Insurance Co.; TIG INSURANCE CO., formerly known as Transamerica Insurance Company; ACE INSURANCE COMPANY OF TEXAS, formerly known as Cigna Insurance Company of Texas; and AMERICAN ZURICH INSURANCE COMPANY,

Defendants-Appellants.

—————————————————————————————

Appeal from the United States District Court
for the Southern District of Texas

—————————————————————————————

January 21, 2003

Before SMITH and BENAVIDES, Circuit Judges, and FITZWATER, District Judge.[*]

FITZWATER, District Judge:

Fraud actions that require proof of individual reliance cannot be certified as Fed. R. Civ. P. 23(b)(3) class actions because individual, rather than common, issues will predominate. The district court certified a nationwide Rule 23(b)(3) class in this RICO[1] fraud action based on alleged

—————————————

[*]District Judge of the Northern District of Texas, sitting by designation.

[1]Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968.

- 3 -

overcharging of workers' compensation insurance premiums. It did so by eliminating, on substantive grounds, plaintiff-specific issues of reliance and causation. We hold that the district court erred as a matter of law in doing so and thus abused its discretion in certifying this case as a class action, and we reverse.

I

A

Plaintiff Sandwich Chef of Texas, Inc., d/b/a Wall Street Deli ("Wall Street"),[2] a company that operates delicatessens in several states, brought this putative class action individually and on behalf of others similarly situated. Wall Street contends that defendants--141 casualty insurance companies--are liable under RICO for committing mail and wire fraud, in violation of 18 U.S.C. § 1962(c)-(d), by charging excessive premiums on retrospectively-rated workers' compensation insurance policies during a 14-year period. Wall Street alleges that defendants corrupted the National Council on Compensation Insurance, Inc. ("NCCI") and used it as a racketeering enterprise to defraud policyholders and state regulators. It maintains that defendants charged excessive premiums to thousands of employers in 44 states and the District of Columbia. Wall Street seeks damages caused by allegedly false filings that defendants and NCCI made with regulators (fraud-on-the-regulator theory) and by inflated invoices sent to policyholders (invoice theory).

Premiums for retrospectively-rated workers' compensation insurance are based on expense factors and loss experience calculated as of the end of the policy period. Policyholders pay an initial premium, subject to a negotiated minimum and maximum range, and receive refunds or credits or pay additional premiums based on losses.

_____

[2]Wall Street states in its brief that it is now known as Wall Street Deli, Inc.

Most employers purchase workers' compensation coverage in the voluntary market. Those who cannot may obtain insurance through legislatively-established involuntary markets, sometimes called "residual markets," "assigned risk markets," or "assigned risk pools." Some states require workers' compensation insurance carriers to reinsure that state's "residual markets," which often results in additional costs to them when operating deficits occur. When residual market assessments dramatically increased, insurers responded by factoring residual market expenses in the price of their voluntary market insurance. Insurance program documents identified these expenses as "residual market charges" (also known as "residual market loads" or "RMLs").

Option V is a rating plan for retrospectively rated workers' compensation insurance policies. NCCI's WC 00 05 endorsement is the approved form in all 45 pertinent jurisdictions for Option V pricing. States set rates for workers' compensation insurance and require that insurers use only approved rates, rating plans, and policy forms. Insurers who sell Option V policies cannot deviate from these rates without regulatory approval. Wall Street purchased four workers' compensation insurance policies from defendant Reliance Insurance Company ("Reliance")[3] during the years 1991 to 1994. Each policy was made subject to retrospective rating by a WC 00 05 endorsement.

Wall Street maintains that insurers sought to pass on RML expenses to their Option V policyholders in the voluntary market, contrary to the terms of the approved rating plan. Defendants instructed NCCI to ask state regulators to amend the Option V rating plan to allow them to pass through their RMLs as an element of the tax multiplier. The tax multiplier is a component of the

---

[3]During the pendency of this appeal, five defendants, including Reliance, which is currently in liquidation, moved to sever and stay their appeals. A panel of this court granted the motion. The motion panel denied without prejudice to reconsideration by this panel defendants' alternative motion to sever and remand the appeal for immediate dismissal. Because we are reversing the class certification order, we need not reconsider the motion panel's order.

premium that includes taxes and other assessments that carriers pay. Defendants also began including unfiled and unapproved RML surcharges in tax multipliers for Option V coverage. All defendants overcharged, and they prevented competition through collusion, such as by sharing information about RML charges.

Wall Street also alleges that defendants used NCCI to deceive state regulators. NCCI filed R-1244, in which it requested that regulators authorize a residual market subsidy to be added to the Option V tax multiplier. R-1244 falsely represented that defendants were not presently including RMLs in their rates and intended only to pass through part of the residual market burden to policyholders. Some regulators accepted R-1244; others granted only part of the request or denied it. Defendants nevertheless passed through their full RML expenses. They used NCCI to make other Option V tax multiplier filings after R-1244, which falsely reflected only partial RML subsidies rather than defendants' actual practice of charging full RML expense.

Wall Street avers that regulators required NCCI to review defendants' Option V applications for compliance with lawful rates and to approve only applications that contained authorized rates. Defendants' applications falsely represented that they were charging approved rates for Option V coverage. In turn, state regulators received NCCI-approved applications that concealed defendants' overcharges. NCCI knew of these overcharges but never disclosed them to the regulators. Defendants routinely provided unapproved forms, rating plans, and rates to policyholders that they did not give regulators. In these forms, defendants characterized their unapproved charges as state assessments or taxes. Defendants also failed to disclose their unlawful RML charges in financial statements filed with regulators.

Defendants have a different view of the pertinent facts. They assert that when Wall Street

requested that Reliance make a proposal for commercial insurance, Wall Street offered to pay the RML expenses that are the subject of its complaint. Wall Street and Reliance negotiated all pricing and payment terms, including RML expenses, and Reliance disclosed to Wall Street that the residual market charges differed from its rate filings. Wall Street bargained for other terms that reduced its insurance costs and that also varied from Reliance's rate filings. Other large employers in the certified class negotiated customized insurance packages that were designed to meet their specified needs at the lowest cost; the policyholders did not want insurance programs that were constricted by filed rating plans; they bargained for programs that departed from filed rates; and, although the programs included residual market charges, they had other features that reduced net costs to below what could have been charged under filed rates. Defendants argue that "each negotiation among a policyholder, its broker, and its insurer created a unique record of oral and written communications directly relevant to the RICO fraud claim." Appellants Br. at 5.

Defendants contend that, due to their complexity, retrospectively rated workers' compensation insurance policies are almost always written for large employers who pay annual premiums that can amount to millions of dollars. Policyholders usually operate in several states and require multiple lines of insurance coverage. Consequently, they frequently request that brokers seek proposals from several carriers. The brokers, in turn, solicit proposals that include requested coverage, services, and payment terms for many types of insurance, including workers' compensation, general liability, and commercial automobile liability, to insure the policyholder in multiple states. Quoted premiums often specify one formula for all such coverage. Negotiations can include face-to-face meetings, telephone conversations, and correspondence that vary in form depending on the deal. Brokers and others, such as professional risk managers, insurance consultants, and lawyers, frequently

participate. Employers and their representatives negotiate customized retrospectively-rated programs that reflect their different operations, risk tolerances, coverage needs, and cash-flow preferences. They also bargain for premium formulas and payment terms that vary according to program.

Defendants also posit that policyholders sought ways to reduce their costs below those set by filed rating plans. Carriers and policyholders negotiated rates that were not as provided in filed rating plans or state regulations, thereby reducing overall program prices below levels that could be charged under the plans. The total cost of the negotiated program depended on many individually-negotiated terms, and the fact that one premium factor, such as the tax multiplier, was higher than that prescribed in a filed plan did not necessarily cause the net cost to exceed what the filed plan allowed. Policyholders usually focused on lowest net cost, not on a single component of cost.

B

Wall Street moved for class certification. Defendants opposed the motion, contending that Wall Street had failed to meet its burden of establishing the adequacy and typicality requirements of Rule 23(a) and the predominance, manageability, and superiority requirements of Rule 23(b)(3). They argued, *inter alia*, that proof concerning the fraud-based RICO claims would necessarily focus on the knowledge of the thousands of employers, brokers, agents, and other insurance personnel who participated in negotiating the insurance programs, and that a trial would consist of evidence concerning thousands of oral and written communications that formed essential parts of these negotiations. Defendants contended that individual issues concerning these communications and the knowledge of each transaction's participants would vastly predominate over any common issues. Following an evidentiary hearing, the district court certified the following class:

> All purchasers (excluding policyholders with a captive insurance company that ultimately reinsure their workers' compensation risk, the defendants and co-conspirators) of workers' compensation insurance policies, effective on or after January 1, 1987, endorsed with a Retrospective Premium Endorsement (NCCI form WC 00 05 series) and not closed by a final premium calculation on or before May 6, 1994, excluding purchasers of policies endorsed as a Large Risk Alternative Rating Option[.]

*Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co.*, 202 F.R.D. 484, 504 (S.D. Tex. 2001) ("*Sandwich Chef II*").

In the context of analyzing Rule 23(b)(3) predominance, the district court rejected defendants' argument that a trial of class claims was impossible due to the predominance of individual issues. *Id.* at 497. The court noted that RICO required both "but for" and "proximate" causation. *Id.* It held that, under our decision in *Summit Properties Inc. v. Hoechst Celanese Corp.,* 214 F.3d 556, 558-61 (5th Cir. 2000), proximate cause in a RICO fraud case could be established if the plaintiff had either been the target of fraud--the target wing--or had relied on the fraudulent conduct of the defendants-- the reliance wing. It concluded that Wall Street had stated a claim under both. *Id.*

The court reasoned that Wall Street could establish causation under the target wing of *Summit*--where individual reliance by class members would not be an issue--based on a fraud-on-the-regulator theory. *Id.* Applying a conclusion it had reached in its earlier summary judgment ruling in *Sandwich Chef of Texas, Inc. v. Reliance National Indemnity Insurance Co.*, 111 F.Supp.2d 867 (S.D. Tex. 2000) ("*Sandwich Chef I*"), the court held that Wall Street could meet the requirement of proximate cause by establishing that class members had been injured by regulators' reliance on defendants' misrepresentations and omissions. *Id.* at 497-98 (citing *Sandwich Chef I*, 111 F.Supp.2d at 876, in which it held that "Wall Street's fraud-on-the-regulator [theory] is cognizable

as a RICO claim after *Summit* because Wall Street has established through the summary judgment evidence that the defendants engaged in a scheme to collect phantom premiums through misrepresentations made to insurance regulators."). Wall Street argued that, when NCCI made its R-1244 filing seeking authority for residual market subsidies in filed rates, it concealed that many defendants were already charging these costs to policyholders. It asserted that the filing misrepresented that defendants intended only a "partial pass-through" of these costs when they in fact charged policyholders a full pass-through. *Id.* at 498. Wall Street also contended that individual defendants made similar deceitful representations directly to regulators that were intended to lead them to believe that defendants were charging filed, rather than inflated, rates. *Id.*

The district court rejected defendants' contention that members of the plaintiff class would be required to demonstrate injury through individual proof. It concluded that Wall Street could first show that regulators relied upon the filings and would have enforced the filed rates. Defendants' conduct, if proved, would demonstrate they understood the necessity of concealing their actual charges by making deceitful filings in violation of state laws, and the impact of their alleged scheme affected all class members the same. *Id.* Wall Street had established predominance and superiority for its target wing claim because its fraud-on-the-regulator theory was a common issue faced by all class members that could be proved or disproved at trial from a common set of facts under a single federal law. *Id.* at 498-99.

The district court also held that Wall Street could meet its obligation to prove proximate cause, without requiring individual proof of reliance, through the reliance wing of *Summit* by means of its invoice theory. *Id.* at 499. The court recognized that, in *Patterson v. Mobil Oil Corp.*, 241 F.3d 417 (5th Cir. 2001), *Bolin v. Sears, Roebuck & Co.*, 231 F.3d 970 (5th Cir. 2000), and *Castano*

*v. American Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996), we had overruled Rule 23(b)(3) certifications because the facts required individual proof of reliance. It distinguished these cases, holding that Wall Street's invoice theory claim was simple in contrast to the ones pursued in *Patterson, Bolin*, and *Castano,* and stating that Wall Street's claim had not been directly addressed by this court. *Id.*

According to the district court's reasoning, under Wall Street's theory of the case, each class member sustained the same injury: an overcharge caused by an inflated invoice. This was classic mail fraud because defendants knowingly sent policyholders invoices that they knew were higher than the filed rates. Since defendants' records provided all information needed to measure the injury for the class and each class member, the invoice theory did not raise complicating factors that would defeat Rule 23(b)(3) certification. The invoice theory also alleged that defendants made but one type of direct misrepresentation to their policyholders: the written invoices. *Id.* at 499-500.

The district court also held that class certification was particularly appropriate when purchasers sought redress for widespread commercial abuses, and that individual proof of reliance did not preclude class certification, because the act of paying an invoice could establish circumstantial evidence of reliance. *Id.* at 500. It concluded that, in a RICO fraud case alleging overcharges, proximate cause (reliance and injury) can be proved by circumstantial evidence of the transaction that results in the overcharge. *Id.* at 500-01. Wall Street sought to prove reliance by circumstantial evidence that the invoices contained inflated premiums that constituted material misrepresentations, omissions, or both, and that the class members paid overcharges as a result. Wall Street and the class were allowed to use the invoices and payment of the invoices as circumstantial evidence of detrimental reliance. They could also present expert witness testimony that businesses customarily and reasonably rely on the accuracy of invoices, especially invoices sent by regulated entities, and that

commercial transactions between businesses occur based on an ethic of honesty and fair dealing. *Id.* at 501.

C

After the district court certified a class, defendants petitioned and obtained leave to appeal under Rule 23(f). They maintain, *inter alia*, that the district court abused its discretion in certifying a class because individual issues of reliance and causation defeat Rule 23(b)(3) predominance.[4]

II

Before we turn to the merits of this appeal, we must address a threshold matter.

Wall Street contends that defendants have improperly cited materials that are outside the evidentiary record and must be stricken.[5] It argues vigorously in its brief, and emphasized during oral argument, that defendants cannot defeat class certification based on a supposed need for individual proof of reliance, because they failed to introduce in the district court evidence that class members had any information relevant to their defense, that any class member paid premiums without relying on an invoice, that a defendant disclosed the fraud to a class member, or that a class member learned about overcharging on its own. Wall Street also maintains that defendants introduced no proof that demonstrated a need to involve individual class members in the trial, that entitled defendants to question individual plaintiffs about reliance or other issues, or that showed that any class member

---

[4]Defendants also argue that proving injury presents significant individual issues of fact and variations in state law; that conspiracy allegations do not eliminate the predominance of individual issues that defeat class certification; and that a class action is not superior to other available methods of adjudication. In view of our disposition of defendants' first argument, we need not address these contentions.

[5]Wall Street also moved to strike defendants' brief and reply brief and to vacate our order granting them leave to appeal. A panel of this court denied the motion.

knew about the illegality of the overcharges or paid a bill without relying on an invoice.

We disagree with Wall Street's argument to the extent it is addressed to evidence we have considered on appeal.[6] In concluding that individual issues predominate in this case, we have relied on evidence that defendants maintain shows that Wall Street and other potential class members, directly or through others, negotiated premiums that varied from filed rates, and that they were aware that carriers were charging them more than the filed rate.[7] Defendants have established that they included this evidence in the certification record by submitting it as prehearing filings or proffering it during the hearing. The district court did not restrict the record to what was admitted in evidence during the hearing. In its class certification ruling, it explicitly considered "the motion, submissions, and applicable law, together with the evidence and arguments of counsel presented at a class certification hearing[.]" *Sandwich Chef II*, 202 F.R.D. at 487. On several occasions during the hearing, the district court confirmed this more expansive intent concerning the scope of the decisional record. *See* R. 42:45[8] ("You can get whatever you want in the record. Okay? I'm letting you because of the scope of this thing."); R. 44:170 ("I'm just going to leave it to both sides to determine if it was in [the record] or not. Let's not get bogged down on that. If there is any question at all, once the record is prepared, look in there; and if anything needs to be withdrawn or added, you do

---

[6]Wall Street objects to 140 citations that defendants make to materials that it contends are outside the class certification record. We have neither relied on any evidence that the district court explicitly excluded nor on factual recitations contained in state court cases that defendants maintain are similar to the instant action.

[7]We reject Wall Street's assertions in its brief and at oral argument that defendants did not adduce evidence in the district court to support their allegations of individual negotiations and knowledge and lack of reliance on alleged misrepresentations.

[8]Citations are to the volume and page of the record on appeal.

it."). For example, when defendants offered in evidence an expert report that they had submitted as an exhibit to their memorandum in opposition to class certification, the district court stated that this was unnecessary because the document was already part of the record. R. 43:132 ("It's already part of the file. I needn't rule on it. Let's leave it not in evidence, but it's part of the record in this case.").

Citing *Jones v. Diamond*, 519 F.2d 1090 (5th Cir. 1975), and *Ezell v. Mobile Housing Board*, 709 F.2d 1376 (11th Cir. 1983), Wall Street argues that, once the hearing is complete, only the evidentiary record determines certification, and that materials not in the record, such as exhibits to prehearing briefs, are not considered. *Jones* and *Ezell* are distinguishable. In *Jones* we held that the district court was not legally compelled to consider facts included in interrogatory answers that the plaintiff had not formally introduced in evidence. *Jones*, 519 F.2d at 1098. We did not hold that such evidence is inadmissible *per se*, nor were we deciding a case like this one, in which the district court clearly opted to consider submissions that were not admitted in evidence during the hearing.[9] In *Ezell* the Eleventh Circuit rejected appellants' reliance on appeal on statistical exhibits and allegations that they had not introduced during the evidentiary hearing but that were merely part of their motions for partial summary judgment and for class certification. *Ezell*, 709 F.2d at 1380. It held that the district court could not consider the exhibits and allegations because they had not been presented as evidence on the certification issue. *Id.* There is no indication in *Ezell* that, as in this case, the district court

_____

[9]Another holding in *Jones* supports defendants' position. We concluded that "[i]f the court finds . . . that an evidentiary hearing on the class is appropriate or essential, it should inform the parties that a full hearing will precede the decision on certification, and that any facts on which they intend to rely to support the motion must be introduced in evidence at that time." *Id.* at 1099. In the present case, the district court did not advise the parties that the facts would be limited to those introduced during the hearing; it did the opposite.

advised the parties that it would consider, and did in fact base its decision on, submissions that were not introduced during the evidentiary hearing.

The evidence on which defendants rely to contend there are individual issues of reliance and causation is properly part of the record below and on appeal.

III

We turn now to the merits. Defendants contend the district court abused its discretion in certifying this case as a class action because, *inter alia*, individual issues of reliance and causation defeat Rule 23(b)(3) predominance.[10]

A

We review the district court's class certification decision for abuse of discretion. *Stirman v. Exxon Corp.*, 280 F.3d 554, 561 (5th Cir. 2002). "If the court's certification was 'erroneous as a matter of law,' however, the court necessarily abused its discretion and the class should be decertified." *Sikes v. Teleline, Inc.*, 281 F.3d 1350, 1359 (11th Cir. 2002) (quoting *Jackson v. Motel 6 Multipurpose, Inc.,* 130 F.3d 999, 1006 (11th Cir. 1997)). "A district court by definition abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100 (1996) (citing *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990)). We review the district court's legal

---

[10]Defendants also argue that the district court abused its discretion in its application of the filed rate doctrine and the parol evidence rule. We need not address these contentions. Wall Street acknowledged during oral argument that the filed rate doctrine and parol evidence rule "cannot eliminate materials that would be exculpatory" and asserted that the district court did not exclude evidence on this basis. *See* Tr. Oral Arg. at 22-23. We agree that neither the filed rate doctrine nor the parol evidence rule prevents a carrier from defending against a fraud claim based on evidence that a policyholder knew of, or agreed to, the rate being charged. And the district court's certification opinion indicates that its discussion of this doctrine and rule related mostly to its assessment of typicality and did not affect its analysis of the predominance component of Rule 23(b)(3), on which this appeal turns.

conclusions *de novo*.  *See Stirman*, 280 F.3d at 562.

> Rule 23(a) requires the plaintiff to show that the class is too numerous to allow simple joinder; there are common questions of law or fact; the claims or defenses of the class representatives are typical of those of the class; and the class representatives will adequately protect the interests of the class.  To receive (b)(3) certification, a plaintiff must also show that the common issues predominate, and that class treatment is the superior way of resolving the dispute.

*Patterson*, 241 F.3d at 418-19 (footnotes omitted).  The party seeking certification bears the burden of proof.  *Stirman*, 280 F.3d at 562.  To decide whether common issues predominate, the district court must consider how a trial on the merits would be conducted if a class were certified.  *Castano*, 84 F.3d at 740.

Causation is one issue to be tried in the present case.  "RICO creates a civil cause of action for "'[a]ny person "injured in his business or property by reason of a violation of section 1962."'" *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 439 (5th Cir. 2000) (quoting *Beck v. Prupis*, 529 U.S. 494, 496 (2000) (quoting 18 U.S.C. § 1964(c))).[11]  The "by reason of" language of RICO has been interpreted by the Supreme Court, *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992), and by this court, *Summit*, 214 F.3d at 558, to require a showing that the fraud was the "but for" cause and "proximate" cause of the injury.  "[*Holmes*] explicitly confirmed that the 'by reason of' language in RICO requires a causal connection between the predicate mail or wire fraud and a plaintiff's injury that includes 'but for' and 'proximate' causation." *Summit*, 214 F.3d at 558.

---

[11]"All RICO violations under 18 U.S.C. § 1962 entail '(1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise.'"  *In re MasterCard Int'l Inc.*, 313 F.3d 257, 261 (5th Cir. 2002) (quoting *Crowe v. Henry*, 43 F.3d 198, 204 (5th Cir. 1995)).

In common law fraud cases, proof of reliance satisfies the "but for" cause, or cause-in-fact, requirement. *See* Restatement (Second) of Torts § 546 (1977) ("The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss suffered by one who justifiably relies upon the truth of the matter misrepresented, if his reliance is a substantial factor in determining the course of conduct that results in his loss."). For a misrepresentation to cause an injury, there must be reliance. Knowledge of the truth defeats a claim of fraud because it eliminates the deceit as the "but for" cause of the damages. *See Summit*, 214 F.3d at 560 n.19 ("If the relevant decisionmakers knew the limitations of the product but would have bought it anyway because of its low price, for example, the fraud would not have been a 'but-for' cause of the plaintiffs' damages."); *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 746-47 (3d Cir. 1996) (affirming dismissal of RICO fraud claim because plaintiff knew true facts and could not have relied on misrepresentation) (cited in *Summit*, 214 F.3d at 560 n.16).

Proximate cause generally demands that a misrepresentation be relied upon by the plaintiff, individually. *See Summit*, 214 F.3d at 562 ("[W]hen civil RICO damages are sought for injuries resulting from fraud, a general requirement of reliance *by the plaintiff* is a commonsense liability limitation." (emphasis added)). RICO fraud cases "require a showing of detrimental reliance *by the plaintiff*, which is consistent with *Holmes*' admonition that federal courts employ traditional notions of proximate cause when assessing the nexus between a plaintiff's injuries and the underlying RICO violation." *Id.* at 560 (footnote omitted) (emphasis added); *see Bolin*, 231 F.3d at 978 ("[A] finding of RICO fraud liability requires a showing of reliance by *each plaintiff*." (emphasis added)).

"[I]ndividual findings of reliance necessary to establish RICO liability and damages preclude . . . (b)(3) certification[.]" *Bolin*, 231 F.3d at 978. "Claims for money damages in which individual

reliance is an element are poor candidates for class treatment, at best.  We have made that plain."

*Patterson*, 241 F.3d at 419.  "According to both the advisory committee's notes to rule 23(b)(3) and this court's decision in *Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 482 F.2d 880 (5th Cir. 1973), a fraud class action cannot be certified when individualized reliance will be an issue." *Castano*, 84 F.3d at 745.  This is so because cases that involve individual reliance fail the predominance test.

> While there may be an issue of fact common to all class members . . . that question does not predominate over the question of whether or not each member of the class suffered a RICO injury. . . . To determine reliance for each individual class member would defeat the economies ordinarily associated with the class action device.

*Patterson*, 241 F.3d at 419.  When a district court certifies a case as a class action, despite the fact that the predominance requirement cannot be met, it errs as a matter of law.  *See id.*

The pervasive issues of individual reliance that generally exist in RICO fraud actions create a working presumption against class certification.  The district court avoided individual issues of reliance by concluding on substantive grounds that these issues would not predominate.  If the court erred in these holdings, its class certification decision was necessarily an abuse of discretion and must be reversed.  *See Sikes*, 281 F.3d at 1359.

B

Relying on our decision in *Summit*, the district court held for two reasons that Wall Street could circumvent individual issues of reliance and causation that usually preclude a finding of predominance. We ruled in *Summit* that, "[i]n general, fraud addresses liability between persons with direct relationships--assured by the requirement that a plaintiff has either been the target of a fraud or has relied upon the fraudulent conduct of the defendants." *Summit*, 214 F.3d at 561.  The district

court concluded that Wall Street could establish proximate cause as to all class members through common circumstantial evidence, either by the target wing or the reliance wing.

We turn first to the reliance wing, which the district court found Wall Street had met through its invoice theory. The district court viewed Wall Street's invoice theory as a relatively simple one. *Sandwich Chef II*, 202 F.R.D. at 499. Each class member was overcharged by means of an inflated invoice that affirmatively misrepresented that the premium charged was the amount lawfully due. *See id.* Individual proof of reliance was not an obstacle to class certification because the act of payment of invoices could establish circumstantial evidence of reliance. *Id.* at 500. This circumstantial evidence consisted of proof that the invoices contained material misrepresentations--inflated premiums--and that the class members had paid overcharges in reliance on the invoices. *Id.* The plaintiff class could "present expert witness testimony that businesses customarily and reasonably rely on the accuracy of invoices, especially invoices sent by regulated entities, and that commercial transactions between businesses occur based on an ethic of honesty and fair dealing." *Id.* at 501.

We conclude that this reasoning is legally flawed. Certification of a class under Rule 23(b)(3) requires that the district court consider how the plaintiffs' claims would be tried. *See Castano*, 84 F.3d at 744. "A district court certainly may look past the pleadings to determine whether the requirements of rule 23 have been met. Going beyond the pleadings is necessary, as a court must understand the claims, *defenses*, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Id.* (footnote omitted) (emphasis added). "Absent knowledge of how [the] . . . cases [will] actually be tried, however, [makes it] impossible for the court to know whether the common issues would be a 'significant' portion of the individual trials." *Id.* at 745. Although the district court recognized the need to address how a trial on the

merits would be conducted, *see Sandwich Chef II*, 202 F.R.D. at 494, it did not adequately account for individual issues of reliance that will be components of defendants' defense against RICO fraud.

Defendants maintain that Wall Street and other potential class members, directly or through others (e.g., brokers), negotiated premiums that varied from filed rates for retrospectively rated workers' compensation insurance. They contend that plaintiffs were aware that carriers were charging them more than the filed rates. Knowledge that invoices charged unlawful rates, but did so according to a prior agreement between the insurer and the policyholder, would eliminate reliance and break the chain of causation. *See Summit*, 214 F.3d at 560 n.19; *Ideal Dairy Farms*, 90 F.3d at 746-47. Defendants have introduced evidence that Wall Street and other class members individually negotiated with insurers regarding workers' compensation insurance premiums. A class cannot be certified when evidence of individual reliance will be necessary. *See, e.g., Patterson*, 241 F.3d at 419 ("Claims for money damages in which individual reliance is an element are poor candidates for class treatment, at best.").

Wall Street and the other plaintiffs must establish at trial that they detrimentally relied on the misrepresentations in the invoices the insurers sent them. Defendants are entitled to attempt to undercut this proof with evidence that might persuade the trier of fact that policyholders knew the amounts being charged varied from rates filed with regulators and that they had agreed to pay such premiums. Although expert testimony about business practices regarding invoices and commercial transactions might convince the trier of fact to find in a policyholder's favor, such opinion evidence would not justify excluding proof demonstrating a lack of reliance by individual plaintiffs. The trier of fact must ultimately decide whether a specific policyholder thought an invoice complied with the approved rate and paid an inflated premium in reliance on that belief.

Accordingly, we hold that the invoice theory does not satisfy the reliance wing of *Summit* and eliminate individual issues of reliance and causation that preclude a finding of predominance of common issues of law or fact. *See id.* (holding that facts of case required individual proof of reliance that would "defeat the economics ordinarily associated with the class action device").[12]

C

The district court also concluded that Wall Street could avoid individual issues of reliance under *Summit*'s target wing, based on a theory of fraud-on-the-regulator. The court reasoned that, under the target wing, individual reliance by class members was not an issue because reliance upon a fraudulent representation or omission by a third person was sufficient if the plaintiff was injured as a result. Wall Street could establish proximate cause by demonstrating that the class members were injured by the regulators' reliance on defendants' misrepresentations and omissions. *Sandwich Chef II*, 202 F.R.D. at 497. The court rejected defendants' contention that individual proof of injury was necessary. It concluded that Wall Street could show that regulators relied upon carrier filings and would have enforced the filed rates; defendants' conduct, if proved, would show that they understood it was necessary to conceal their actual charges by making deceitful filings in violation of state laws; and the impact of defendants' alleged scheme affected all class members the same. *Id.* at 498. Therefore, Wall Street's target wing claim based on a fraud-on-the-regulator theory was a common issue faced by all class members that could be proved or disproved at trial from a common set of facts under a single federal law. *Id.* at 498-99.

---

[12]In a post-argument brief, Wall Street maintains that a holding in the Third Circuit's recent decision in *In re Linerboard Antitrust Litigation*, 305 F.3d 145 (3d Cir. 2002), rejects defendants' position concerning the necessity for individual proof concerning policyholders' knowledge under the reliance wing. The holding and reasoning of *Linerboard* that plaintiffs cite does not affect our analysis, and we need not address their argument.

We hold that the district court erred in concluding that the target theory could be invoked to excuse proof of individual reliance on fraudulent predicate acts. We have applied the target theory narrowly. *See Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 564 (5th Cir. 2001) (referring to target theory set out in *Summit* as narrow exception to rule that in civil RICO claims in which fraud is alleged as predicate act, reliance on fraud must be shown). In *Summit* we cited *Mid Atlantic Telecom, Inc. v. Long Distance Services, Inc.*, 18 F.3d 260, 263-64 (4th Cir. 1994), as holding open, under the target wing, "the possibility that a plaintiff company may not need to show reliance when a competitor lured the plaintiff's customers away by fraud directed at the plaintiff's customers." *Summit*, 214 F.3d at 561. But we declined to apply the theory because the plaintiffs did not contend they were the targets of a scheme to defraud accomplished by defrauding others. *Id.*

*Mid Atlantic* involved RICO fraud and conspiracy claims by Mid Atlantic Telecom, Inc. *("Mid Atlantic")*, a reseller of long distance telecommunications services, against Long Distance Services, Inc. ("LDS"), its competitor, and LDS's president. Mid Atlantic alleged that it had been injured by LDS's fraudulent conduct directed toward some of LDS's own customers. By improperly inflating the customers' bills, LDS was able to offer Mid Atlantic's customers artificially low rates and force Mid Atlantic to match the rates in order to keep its customers. *Mid Atlantic*, 18 F.3d at 261. The Fourth Circuit rejected defendants' argument that Mid Atlantic could not establish proximate cause because their alleged conduct had been directed toward customers of Mid Atlantic and LDS rather than toward Mid Atlantic. *Id.* at 263. The court held that, with discovery, Mid Atlantic might be able to prove that, although defendants initially aimed the scheme only at LDS's customers, the company president broadened the scheme to include Mid Atlantic as a direct target, and discovery might reveal that the artificially low billings to Mid Atlantic customers were purposely

devised to injure Mid Atlantic. *Id.* This was so because Mid Atlantic did not seek derivative injuries; it claimed distinct and independent injuries caused by the necessity of offering lower rates to match LDS's fraudulent ones. *Id.* at 264.

In *Procter & Gamble* we applied the target theory to hold that Procter & Gamble had stated a RICO claim sufficient to survive Rule 12(b)(6) dismissal where its competitor had allegedly spread a rumor that caused consumers to stop purchasing Procter & Gamble's products. *Procter & Gamble*, 242 F.3d at 565. We concluded that, even though Procter & Gamble had not relied on the fraud, if its customers had done so in deciding to boycott its products, this reliance could fall within the narrow exception carved out in *Summit* and would suffice to show proximate cause. *Id.*

The reasons for our narrow application of the target theory, and for its inapplicability in the present case, can be derived from foundational principles of RICO causation jurisprudence. Before the Supreme Court decided *Holmes*, "[t]he Courts of Appeals ha[d] overwhelmingly held that not mere factual, but proximate, causation is required." *Holmes*, 503 U.S. at 266 n.11. *Holmes* agreed with the lower courts' conclusion--"[p]roximate cause is thus required," *id.* at 268--and it gave meaning to the concept of proximate cause in the context of civil RICO:

> Here we use "proximate cause" to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts. At bottom, the notion of proximate cause reflects "ideas of what justice demands, or of what is administratively possible and convenient." Accordingly, among the many shapes this concept took at common law was a demand for some *direct relation between the injury asserted and the injurious conduct alleged*. Thus, a plaintiff who complained of harm *flowing merely from the misfortunes visited upon a third person* by the defendant's acts was generally said to stand at *too remote a distance to recover*.

*Id.* at 268-69 (emphasis added) (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser and*

*Keeton on Law of Torts* § 41, at 264 (5th ed. 1984)) (other citations omitted).

In enacting RICO, Congress obviously adopted "the Clayton Act direct-injury limitation among the requirements of § 1964(c)." *Id.* at 272. *Holmes* relied on three reasons for concluding that such directness of relationship has been one of the central elements of causation. *Id.* at 269 (addressing requirements of Clayton Act, but stating *infra* at 270 "that the facts of the instant case show how these reasons apply with equal force to suits under § 1964(c)."). "First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors." *Id.* (citation omitted). "Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries." *Id.* (citations omitted). Third, "the need to grapple with these problems is simply unjustified by the general interest in deterring injurious conduct, since directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely." *Id.* at 269-70 (citation omitted).

*Holmes* therefore teaches that a RICO plaintiff must show a "direct relation between the injury asserted and injurious conduct alleged[,]" and that a RICO predicate act "visited upon a third person" is generally too remote to permit a recovery from a person who complains of injury flowing from that act. *Id.* at 268. Consistent with this understanding of *Holmes*, we held in *Summit* that the plaintiffs could not establish reliance on defendants' fraud because their "risks of injuries did not arise as direct and contemporaneous results of any alleged fraud, but instead arose only later, through the purchases of allegedly defective plumbing by transactions which were not tai nted with fraud." *Summit*, 214

F.3d at 561 n.22 (citations omitted).

Thus under the target wing recognized in *Summit* and applied in *Procter & Gamble*, there is a narrow exception to the requirement that the plaintiff prove direct reliance on the defendant's fraudulent predicate act. This exception only comes into play when the plaintiff can demonstrate injury as a direct and contemporaneous result of fraud committed against a third party, because in this limited context there is a sufficient "direct relation between the injury asserted and the injurious conduct alleged" to comport with the RICO requirement of proximate cause. This understanding of *Holmes* and our jurisprudence clearly explains how the narrow exception was correctly applied in *Mid Atlantic* and *Procter & Gamble*. The facts of these cases illuminate the guiding principle of *Summit*'s narrow exception and the critical distinction between cases that properly apply it and those that do not.[13]

In *Mid Atlantic* and *Procter & Gamble* there were direct and contemporaneous relationships between the acts of fraud directed against the third parties and the harm the plaintiffs incurred. When Mid Atlantic's customers relied on fraudulent communications about rates, it had to lower its charges to avoid losing them as customers. When Procter & Gamble's competitor spread false rumors, it lost sales due to a customer boycott. The risks of injuries arose in both *Mid Atlantic* and *Procter & Gamble* as direct and contemporaneous results of the allegedly fraudulent predicate acts.

But the exception adopted in *Summit* has clear and constricted parameters that Wall Street

---

[13]We have no occasion to address in all its dimensions what constitutes proximate cause in a RICO fraud case. Consistent with *Holmes*, 503 U.S. at 272 n.20, we disavow any intent to adopt a bright-line rule for establishing proximate cause in all or even most contexts. Nor do we foreclose the possibility that fraud upon a third party can constitute proof of reliance by a plaintiff under circumstances not present in today's case. We simply conclude that Wall Street's specific fraud-on-the-regulator theory is legally inadequate to avoid the necessity of proving individual reliance by policyholders.

cannot satisfy in this case. Under Wall Street's target theory, there is no similar direct and contemporaneous relationship between the fraudulent acts directed against regulators and the harm Wall Street and the other plaintiffs incurred. Assuming that defendants and NCCI misrepresented in regulatory filings that they were charging lawful rates, the injury to plaintiffs could have arisen only after defendants attempted to charge plaintiffs inflated premiums, and the regulators--because they had been deceived--did not intercede to prevent the fraud. When Wall Street's theory is analyzed properly, it is apparent that no injury could have been incurred without a plaintiff's subsequent reliance on an inflated invoice. The fact that a regulator was completely in the dark about a carrier's true premium charges would not of itself have injured a policyholder. We do not reject the possibility that defrauding a regulator could, in the proper case, proximately cause injury. But we hold that fraud on the regulator, as Wall Street contemplates it, does not constitute a direct and contemporaneous RICO injury to a policyholder because it would always be necessary for the regulator to be deceived *and* for the policyholder to pay an unlawfully-inflated premium. Although disclosure of the true premiums to a regulator could *prevent* injury to policyholders by prompting the regulator to interdict the carrier's attempt to bill at an inflated rate, concealment of inflated premiums would not result in direct and contemporaneous injury to the policyholder without the additional act of billing. The regulator's reliance on the fraudulent act would not alone be enough to result in a direct and contemporaneous injury to a policyholder that satisfies RICO's proximate cause requirement.

We therefore disagree with the district court that the fraud-on-the-regulator theory is a common issue faced by all class members that may be proved or disproved at trial from a common set of facts. Because Wall Street cannot rely on *Summit*'s target wing, plaintiffs must demonstrate

causation on an individual basis, which defeats predominance and certification of a Rule 23(b)(3) class.

*    *    *

The district court relied in error on certain legal principles to eliminate individual issues that predominate in this RICO fraud case and that preclude certification of a Rule 23(b)(3) class. These RICO fraud cases must be tried individually. Wall Street and other plaintiffs are entitled to prove at trial that the insurers with whom they contracted to provide workers' compensation insurance defrauded them, in violation of 18 U.S.C. § 1962, by charging premiums that exceeded approved rates. But defendants are equally entitled to defend themselves by offering, for example, evidence that an individual plaintiff, directly or through a broker, negotiated a premium that varied from the filed rate, was aware that the insurer was charging more than what regulators had approved, and therefore was not a victim of fraud. Accordingly, the class certification order is

REVERSED.